LARSON v VAN HORN

Docket Nos. 51726, 51727. Submitted May 13, 1981, at Marquette.—
Decided October 19, 1981.

William K. Van Horn and Charles J. Van Horn, doing business
as Bloomfield Leasing Associates, purchased an automobile,
obtaining financing from Florida Coast Bank of Oceanside, a
Florida bank. The bank did not perfect its security interest in
the auto. Bloomfield obtained a Michigan certificate of title
which did not indicate the security interest of the bank. Bloom-
field sold the auto to Howard H. Larson under an agreement
whereby a substantial portion of the purchase price was paid in
cash in order to avoid taxes on the transaction. Bloomfield
assigned the certificate of title to Larson, who never applied for
a new certificate of title or transferred registration of the auto.
The bank subsequently became aware that it did not have a
perfected security interest and that Bloomfield was delinquent
on its note. After attempting collection on the note the bank
made an agreement with Jim Schea, an employee of Executive
Motor Werks, Ltd., whereby Schea was to repossess the auto
and would be able to purchase it for the amount owing on the
note. The bank further agreed to indemnify Schea for any
losses or claims arising out of the repossession. Schea, employ-
ing a ruse, enticed Larson to bring the auto to Executive Motor
Werks, where an employee took possession, and informed Lar-
son that the auto was being repossessed. Schea promptly paid
an agent of the bank the amount agreed upon and received a
certificate of title which Schea had previously aided the bank
in obtaining by filing an affidavit and application containing

REFERENCES FOR POINTS IN HEADNOTES
[1, 4] 7A Am Jur 2d, Automobiles and Highway Traffic §§ 31, 32.
[2] 7A Am Jur 2d, Automobiles and Highway Traffic §§ 38, 39.
[3] 28 Am Jur 2d, Estoppel and Waiver § 1.
[5] 3 Am Jur 2d, Agency §§ 202-205, 329.
[6] 22 Am Jur 2d, Damages §§ 165-168.
    Attorneys' fees or other expenses of litigation as element in mea-
        suring exemplary or punitive damages. 30 ALR3d 1443.
[7] 18 Am Jur 2d, Conversion § 82.

false information regarding the date of repossession. The auto thereafter was sold to an out-of-state buyer.

Larson brought an action for conversion against the Van Horns, the bank, Schea and Executive Motor Werks, Ltd. The Marquette Circuit Court, John E. McDonald, J., entered a judgment in favor of Larson against all of the defendants in the amount of $23,000, which the court found to be the value of the auto at the time of the conversion. The court also held that the bank was entitled to indemnity from the other defendants, that Schea and Executive Motor Werks were entitled to indemnity from the Van Horns and Bloomfield Leasing, and that Schea and Executive Motor Werks were additionally liable to Larson for $10,500 in exemplary damages, an amount approximately equal to Larson's legal expenses in the action. Defendants bank, Schea and Executive Motor Werks appealed, and Larson cross-appealed on the measure of damages. *Held:*

1. Because the bank did not perfect its security interest and because Larson had no actual knowledge of the security interest, Larson took the auto as a buyer in the ordinary course of business, free of any security interest. His property rights in the auto were superior to the bank's, and the attempt of the bank to repossess the auto under color of the security agreement was unlawful conversion.

2. Larson's failure to change the title and registration does not prevent him from raising his superior property rights as to the bank. Schea knew that Larson had received an endorsed certificate of title from Bloomfield, and Schea's knowledge that Bloomfield no longer owned the auto was imputed to the bank under the doctrine of *respondeat superior.*

3. Similarly, because Schea had actual knowledge of Larson's ownership, Larson's failure to title and register the auto do not bar his recovery from Schea.

4. The trial court did not err in finding Schea and Executive Motor Werks liable to the bank. An agent may be found liable to his principal where the agent acts outside his authority and misleads the principal. The finding that Schea was the most culpable of the defendants was not clearly erroneous.

5. The award of exemplary damages in the amount of Larson's attorney fees was not erroneous. These damages are properly born by Schea and Executive Motor Werks.

6. The measure of damages as the fair market value of the auto at the time of conversion was proper.

Affirmed.

1. AUTOMOBILES — TITLE — CERTIFICATE OF TITLE.

A buyer's failure to apply for registration and a certificate of title for a motor vehicle does not render void his ownership interest in the vehicle where title passed to him upon endorsement of a certificate of title transferred to him by the seller.

2. AUTOMOBILES — SECURITY INTERESTS — BUYER IN ORDINARY COURSE OF BUSINESS — STATUTES.

A buyer of an automobile who has no actual knowledge of a bank's prior security interest in the automobile, which interest had not been perfected by the bank, takes the vehicle free of any security interest of the bank as a buyer in ordinary course of business and has property rights in the automobile superior to those of the bank (MCL 440.1201[9], 440.9307[1]; MSA 19.1201[9], 19.9307[1]).

3. ESTOPPEL — WORDS AND PHRASES.

A party is estopped to deny the existence of a state of facts if his conduct induces another to believe in the existence of those facts and the other acts upon that belief to his prejudice.

4. AUTOMOBILES — TITLE — CERTIFICATE OF TITLE.

A certificate of title to a motor vehicle is an indicia of ownership, and title to a vehicle passes upon delivery of a properly executed assignment of title.

5. AGENCY — LIABILITY OF PRINCIPAL — NEGLIGENT OR WRONGFUL ACTS.

An agent who subjects his principal to liability because of a negligent or other wrongful act is subject to liability to the principal for the loss which results therefrom unless the agent has been authorized to act in the manner in which he acts.

6. DAMAGES — COSTS — ATTORNEY FEES — EXEMPLARY DAMAGES.

Generally, attorney fees are not recoverable as an element of costs or damages; however, an award of attorney fees to a plaintiff as exemplary damages is not improper where a defendant was guilty of intentional wrongdoing which necessitated the plaintiff's bringing the action.

7. CONVERSION — DAMAGES.

The proper measure of damages in an action for conversion is the fair market value of the item converted at the time of conversion.

*Kendricks, Bordeau, Casselman, Adamini & Keefe, P.C.,* for plaintiff.

*Seitz, Osstyn, Bays & Plummer,* for Jim Schea and Executive Motors Werks, Ltd.

*Clancey, Hansen, Chilman, Graybill & Greenlee, P.C.,* for Florida Coast Bank of Oceanside.

Before: D. E. HOLBROOK, JR., P.J., and M. F. CAVANAGH and BEASLEY, JJ.

PER CURIAM. Plaintiff brought an action for conversion and received a judgment following a nonjury trial. Defendants Florida Coast Bank of Oceanside, Jim Schea and Executive Motor Werks, Ltd., appeal by right, and plaintiff cross-appeals the measure of damages awarded to plaintiff. For purposes of this opinion, we substantially adopt the trial court's findings of fact as follows.

"On or about December 24, 1975, Bloomfield Leasing Associates, a Michigan co-partnership, consisting of Charles J. Van Horn and William K. Van Horn * * *, hereinafter called Bloomfield, purchased a 1972 Rolls Royce automobile, bearing Vehicle Identification No. LRA 12353, hereinafter called 'Rolls', and obtained financing from Florida Coast Bank of Oceanside, of Pompano Beach, Florida, hereinafter called 'the Bank'. Bloomfield executed a promissory note and security agreement in favor of the Bank on December 24, 1975, in the amount of $11,132.40. The security agreement stated, and the Bank knew, that the Rolls was to be used primarily at 3080 West Huron, Pontiac, Michigan. At the time of the transaction, Bloomfield was engaged in the business of selling and leasing new and used vehicles. The Bank did not perfect its security interest in the Rolls by placing its lien on a certificate of title or filing a financing statement under either Michigan or Florida law. On about February 17, 1976, Bloomfield

filed an application for a Michigan title with the office of the Secretary of State and failed to indicate a security interest in favor of the Bank. A Michigan certificate of title was issued to Bloomfield with no evidence of a security interest in favor of the Bank. Bloomfield delivered to the Bank a copy of an application for a Michigan title on which the security interest of the Bank was noted on the application form. However, the original of this application form was never submitted to the Secretary of State's office for the transfer of title.

"In July, 1976, responding to an advertisement in a Detroit newspaper offering the Rolls for sale, Howard H. Larson of Marquette, got in touch with Bloomfield about the Rolls by telephone. Larson had no prior dealings with Bloomfield but was interested in acquiring the Rolls. * * *

"On or about August 13, 1976, Bloomfield agreed to sell and Larson agreed to buy the Rolls for the sum of $21,500.00, subject to Larson's right to inspect. Bloomfield sent the Rolls to Marquette with two of its employees. The seller insisted that $5,000.00 of the purchase price be paid by bank money order and $16,500.00 in cash.

"It was Larson's understanding that Bloomfield Leasing was requiring the payment of $16,500.00 in cash so that Bloomfield could cheat the Internal Revenue Service.

"'* * * [T]wo representatives of Bloomfield Leasing * * * drove the Rolls to Larson's farm in Rock, Michigan. * * * Larson gave these representatives a cashier's check or money order in the amount of $5,000.00 and $16,500.00 in cash * * *. Larson requested a receipt indicating that he had paid $21,500.00 to Bloomfield Leasing for the Rolls. In addition, the men presented Larson with a receipt that had been previously prepared and signed by William Van Horn indicating that Larson had paid $5,000.00 for a damaged 1972 Rolls Royce long wheel base automobile. * * *

"At the time of the delivery of the automobile to Larson, [Bloomfield's representatives] presented him with Michigan Certificate of Title No. 417147V, which was properly signed and notarized and which gave no indication of the Bank's security interest in the Rolls.

* * *

"Larson never made application to the Michigan Secretary of State for a new certificate of title or to transfer registration from Bloomfield Leasing to him. He did not pay the sales tax on the purchase price of the automobile at the time of purchase nor at any time subsequent to purchase. * * *

* * *

"In December, 1977, [sic] the Bank's assistant loan officer, Ralph Mabry, became aware of the fact that the Bank did not have the title to the Rolls in its file with evidence of a perfected security interest and that Bloomfield was delinquent in its note. Demand was made on Bloomfield for payment in full with no success. On or about March 31, 1977, the Bank, through Mabry, retained the services of Bruce Fletcher, a private investigator, as its agent. Mr. Fletcher had been used by the Bank on past occasions, and the Bank instructed Fletcher to repossess the Rolls on sight. On March 31, 1979, [sic][1] the Bank gave Fletcher written authority to repossess the Rolls. Within the day, Fletcher made contact with Jim Schea, who was employed by Executive Motor Werks, Ltd., a car dealership in Warren, Michigan, owned by his father, who claimed he knew where the Rolls was located. Schea informed the Bank that Van Horn (Bloomfield) had given him a bad check on another transaction and the Bank told him that if he could find the Rolls and pay off the Bank note of $7,957.75, he could recoup his loss which was approximately $5,100.00.

"Schea indicated that he would not proceed with the repossession unless the Bank would indemnify him from any losses or causes of action that might occur as a result of the repossession of the Rolls. Schea further requested a copy of the security agreement. Finally, Schea requested that the offer to sell him the Rolls and the indemnification be put in writing and forwarded to him by telegram and confirming letter.

[1] The trial court presumably meant to say that Mabry became aware of the Bank's unperfected security interest in December, 1976, and gave Fletcher written authority to repossess the vehicle on March 31, 1977.

"Mr. Mabry, who testified that he had authority to enter into such agreement, agreed to the conditions and stated that it was the usual practice of the Bank to indemnify its agents in such repossession cases. Written authorization in the form of a telegram and subsequent letter to repossess the Rolls was given to Schea and Executive Motor Werks by the Bank. The language of the telegram is as follows:

" 'This is your authorization to take possession of one 1972 Rolls Royce Silver Shadow VIN Serial Number LRA 12353 with a lien amount of $7,957.75.

" 'You may purchase said vehicle for the sum of $7,957.75 upon repossession.

" 'We agree to indemnify and save you harmless from and against any and all losses, damages, claims and actions resulting from or arising out of your efforts to collect this assignment.'

"The Bank followed up the telegram with a letter to Schea on April 1, 1977, containing similar indemnity language.

\* \* \*

"After being retained by the Bank to repossess the Rolls, Schea called Larson from Detroit and stated he was interested in selling Rolls Royces to members of the Rolls Royce Club of which Larson was a member.

"\* \* \* Schea telephoned a Rolls Royce dealership in Chicago and ordered a set of keys for the Rolls, based on the serial number. \* \* \*

"\* \* \* Schea ordered a title history from the Michigan Secretary of State indicating that title to the Rolls was in Bloomfield Leasing, with no lien.

\* \* \*

"[Schea enticed Larson to bring the Rolls to Warren, Michigan, by telling him, falsely, that he could arrange a deal on another Rolls in which Larson had expressed interest.]

"On April 18, 1977, following the verbal agreement, Larson drove the Rolls from Marquette to the Executive Motor Werks in Warren. \* \* \* Larson drove the Rolls into the alley in back of Executive Motor Werks and walked into the office where he was greeted by Schea.

Schea called an employee and instructed him to take the Rolls next door and put it on the hoist because 'we want to make certain there is no damage to the undercarriage,' with further instructions to 'be careful' with the Rolls. Employees of Executive Motor Werks took off the license plates and brought Larson's luggage into the office.

"Then an employee of Executive Motor Werks took physical possession of the Rolls * * *.

*  *  *

"Fletcher, who had flown from Florida with a power of attorney from the Bank, was paid $7,984.00 by Schea for the car, and then signed the certificate of title that had been obtained in the name of the Bank from the Michigan Secretary of State over to Schea.

*  *  *

"The only information that Mabry [of the Bank] ever had concerning the car was when Schea told him that the car was somewhere in Ohio. When asked for further information concerning the location of the automobile, Schea refused to respond, so that at no time did Mabry ever know the identity of the person having possession of the vehicle.

"[Also prior to the repossession] Mabry did get in touch with the Michigan Department of Motor Vehicles in Lansing and was told that the certificate of title that had been issued on the Rolls in Michigan contained no lien in favor of the Bank. The Secretary of State's office was advised by Mabry of the situation the Bank was in, and the Secretary of State's office suggested that various forms be obtained and that a title could be issued with the lien on it. Mabry did receive the forms from the Michigan authorities, but they were never used.

"Schea convinced Mabry that there were faster ways to accomplish his purpose than to fill out the forms sent to the Bank by the Department of State of Michigan. Schea was very 'helpful' in advising the Bank how it could obtain title in Michigan and Mabry did authorize Schea to act as the Bank's agent to apply for a repossession title to the Rolls which would show Florida Coast Bank of Oceanside as owner of the vehicle."

The trial court also found that:

"On April 7, 1977, Schea, as agent of the Bank, signed an affidavit of repossession wherein he swore that the Rolls was lawfully repossessed on the seventh day of April, 1977 and that on January 26, 1977, he had served by certified mail a notice of sale on Charles J. Van Horn, 3080 W. Huron, Pontiac, Michigan. The affidavit of repossession and an attached application for certificate of title, signed by Schea, were filed by Schea in the Secretary of State's office on April 11, 1977 for the purpose of obtaining a certificate of title in the name of the Bank, so that Schea could obtain a title from the Bank as soon as he obtained physical possession of the car. Schea admits that he swore falsely on the affidavit and that he did not obtain possession of the Rolls until April 18, 1977."

The Rolls was purchased from Schea by a buyer from Ohio in May, 1977, for $20,000, as is. Repairs in the amount of $2,597.12 were made to it. The Ohio buyer sold the Rolls to a Massachusetts doctor in October, 1977, for $16,000 and the trade-in of a 1957 Bentley considered to be worth about $10,000.

After hearing testimony, the trial court concluded that the taking of the Rolls from Larson's possession and ownership was an act of intentional conversion by Schea and that the Bank did not authorize the tactics used by Schea in gaining possession and disposing of the Rolls. The court found that the retail value of the Rolls at the time of the conversion was $23,500 and that plaintiff Larson was entitled to judgment against each of the defendants, William K. Van Horn and Charles J. Van Horn, individually and doing business as Bloomfield Leasing Associates, Florida Coast Bank of Oceanside, Florida, and Jim Schea and Executive Motor Werks.

The trial court further held that the Florida Coast Bank of Oceanside, Florida, was entitled to a judgment for indemnity in the amount of $23,500 from William K. Van Horn and Charles J. Van Horn, doing business as Bloomfield Leasing Associates, from Jim Schea and the Executive Motor Werks and that Jim Schea and Executive Motor Werks were entitled to a judgment for indemnity in the amount of $23,500 against the Van Horns and Bloomfield Leasing. Finally, the court held that, in addition to the damages suffered by Larson in having his Rolls converted by Schea, Larson also suffered actual damages in the amount of attorney fees he must pay, his legal expenses being $9,255.51 at the time of the hearing and $500 per day with post-trial briefs at $60 an hour, with two days of trial time involved. The court found that Larson was entitled to "exemplary damages in the amount of $10,500 from defendant Jim Schea and Executive Motor Werks" and that, as to the exemplary damages, neither Jim Schea nor Executive Motor Werks were entitled to indemnity from any other party.

Defendants raise several issues on appeal. Defendant Bank argues that it was error for the trial court to find in plaintiff's favor because plaintiff should have been estopped from asserting any ownership rights that he may have had as a basis for damages arising out of the Bank's conduct in repossessing the Rolls. The Bank argues plaintiff's own conduct in violation of the registration and title requirements of Michigan law contributed directly to the Bank's belief (and indirectly through its agent) that Bloomfield was still the owner of the vehicle as was indicated by the check with the Secretary of State's office prior to the repossession.

Bloomfield, as a dealer engaged in selling or exchanging automobiles, failed to comply with the Michigan Vehicle Code's requirement that a dealer make application for a new title and secure a certificate of registration within 15 days of delivering a vehicle to a purchaser. MCL 257.217(2); MSA 9.1917(2). Plaintiff failed to comply with the requirement of the Vehicle Code that he make application to the Secretary of State for registration of the vehicle and for issuance of a certificate of title for the vehicle. MCL 257.217(1); MSA 9.1917(1). However, plaintiff's failure to comply with § 217(1) would not void his ownership interest as title passed to him upon endorsement of the certificate of title transferred by Bloomfield. *Kruse v Carey,* 259 Mich 157; 242 NW 873 (1932). Because the Bank did not perfect its security interest, and because, as the trial court found, plaintiff had no actual knowledge of the security interest, plaintiff took the Rolls free of any security interest of the Bank as a "buyer in ordinary course of business". MCL 440.9307(1); MSA 19.9307(1), and MCL 440.1201(9); MSA 19.1201(9). Plaintiff had property rights in the Rolls superior to the Bank; therefore, the Bank's attempt through its agent to repossess the Rolls under color of the security agreement was unlawful conversion.

Defendant Bank urges us to find that plaintiff is estopped from raising his superior property rights because of plaintiff's failure to comply with the registration and certificate of title requirements of the Vehicle Code. The general principle of equitable estoppel is stated in *Detroit Savings Bank v Loveland,* 168 Mich 163, 172; 130 NW 678 (1911):

"Estoppel is a bar which precludes a person from denying the truth of a fact which has in contemplation of law become settled by the act of the party himself,

express or implied. If one's conduct *induces another to believe in the existence of certain facts, and the other acts thereon to his prejudice,* the former is estopped to deny that the state of facts does in truth exist." (Citations omitted, emphasis supplied.)

The defect in the Bank's argument stems from the fact that Schea knew that plaintiff had purchased the car from Bloomfield and received an endorsed certificate of title. Thus, Schea was not induced to believe that Bloomfield still owned the Rolls by plaintiff's failure to apply for a new certificate of title. The trial court also found that under the doctrine of *respondeat superior* Schea's knowledge, as agent of the Bank, would be imputed to the Bank. Since Schea and the Bank did not rely upon record title, an essential element of equitable estoppel is missing, and plaintiff is not estopped from relying on his superior property rights.

Likewise, we reject defendant Schea's argument that plaintiff's recovery is barred because of plaintiff's unlawful failure to title and register the Rolls. Defendant Schea had actual knowledge that plaintiff purchased the Rolls from Bloomfield and received an endorsed certificate of title. A certificate of title is "an indicia of ownership", 60 CJS, Motor Vehicles, § 42(3), p 294, and "title [to a motor vehicle] passes upon delivery of a properly executed assignment of title, and not before * * *". *Noorthoek v Preferred Automobile Ins Co,* 292 Mich 561, 567; 291 NW 6 (1940), citing *Kruse v Carey, supra.* Schea went ahead with his repossession despite the fact that he had actual knowledge of plaintiff's ownership. Thus, plaintiff's failure to comply with the Vehicle Code had no causal connection to Schea's conduct, except for the possibility that Schea erroneously believed that plain-

tiff's violation would somehow justify his own unlawful conduct.

Next, defendant Schea contends that he and Executive Motor Werks are entitled to indemnity from defendant Bank under a written agreement. Not only did the trial court refuse to allow defendant Schea indemnity from the Bank, it ordered:

"[T]hat Florida Coast Bank of Oceanside, Florida (Bank) recover from William K. Van Horn and Charles J. Van Horn, individually and doing business as Bloomfield Leasing Associates, Jim Schea and Executive Motor Werks, Ltd., any amount paid by Bank to plaintiff pursuant to the terms of this judgment."

The trial court held the Bank liable for conversion on the theory of *respondeat superior,* but also found that Schea had acted outside the scope of his agency and had misled the Bank. There is support for allowing a principal to recover from his agent under these circumstances. Restatement Agency, 2d, § 401, comment d, pp 239-240, states in pertinent part:

"Unless he has been authorized to act in the manner in which he acts, the agent who subjects his principal to liability because of a negligent or other wrongful act is subject to liability to the principal for the loss which results therefrom. * * *

"[However] [i]f the principal authorizes a tort, either advertently or inadvertently, he cannot recover for harm resulting to him from it. Hence, if the principal directs the agent to do an act which, to the knowledge of the agent, is either tortious or criminal, the agent is subject to no liability to the principal, *unless he should realize that the principal is mistaken and believes the act to be a lawful one,* in which case the agent would not be authorized to perform it." (Emphasis supplied.)

The Bank's written authorization to Schea was

stated in broad terms. Schea was authorized to take possession of the Rolls Royce without restrictions or further instructions. The Bank contends that it authorized the repossession because it was relying on the record title showing that Bloomfield was still the owner of the Rolls, and the trial court found that Schea had misled the Bank into continued reliance on this state of facts despite the presence of some testimony which if believed would have indicated that the Bank may have had knowledge of another's interest in the Rolls resulting from Bloomfield's business of leasing and selling automobiles and from Schea's communications with the Bank. At a minimum, the Bank should have required more details surrounding the repossession and the identity of the person in possession of the Rolls. If such information was not forthcoming from Schea, the Bank should have withdrawn its authorization. The trial court found, however, that defendant Schea was the most culpable of the defendants and we do not find this holding to be clearly erroneous. Defendant Schea should not be allowed to seek indemnity for his intentional tortious act by relying on an agreement to indemnify which would be contrary to public policy if applied to this case. *Klann v Hess Cartage Co,* 50 Mich App 703, 706; 214 NW2d 63 (1973).

The trial court found that plaintiff had "suffered actual damages in the amount of attorney fees he must pay". It also found that plaintiff had incurred legal expenses in excess of $10,000 and awarded plaintiff $10,500 from defendants Jim Schea and Executive Motor Werks exclusively. Thus, the exemplary damages were meant to award attorney fees to plaintiff. Defendant Schea contends that the trial court's award of exemplary damages approximating the amount of attorney

fees was improper but that, if this Court does not find the award in error, all defendants should be assessed, rather than defendant Schea alone.

Michigan recognizes the general rule against allowing recovery of attorney fees as an element of costs or damages, but there are many statutory and judicially created exceptions. The rule and exceptions are fully set forth in *State Farm Mutual Automobile Ins Co v Allen,* 50 Mich App 71, 77-78; 212 NW2d 821 (1973), where the Court noted:

> "Some jurisdictions allow attorneys' fees to be taken into consideration in determining the amount of exemplary damages. * * * One Michigan case affirmed an award of exemplary damages in apparent recognition of this principle, *Oppenhuizen v Wennersten,* 2 Mich App 288, 299; 139 NW2d 765, 771 (1966)."

This Court is not prepared to say that *Oppenhuizen v Wennersten, supra,* stands for the general proposition that attorney fees may be awarded as a measurable element of exemplary damages. There were two defendants in the *Oppenhuizen* case, and the Court found that because the one defendant, actually guilty of wrongdoing, had committed an intentional fraud, the plaintiff and the other defendant were entitled to exemplary damages because of the embarrassment they had suffered and because "it was necessary * * * to incur liability for the costs of collecting damages". 2 Mich App 298. The *Oppenhuizen* Court went on to cite from authority supporting another well-noted exception to the general rule against awarding attorney fees, which allows a party to recover attorney fees against one whose conduct has caused the party to prosecute or defend an action against a third person. *Allen, supra,* 78-79.

*Allen* refers to this as the "prior litigation" exception.

As found in *Allen,* the fact that a number of claims are brought in a single lawsuit does not mean that one or some of the claims cannot be considered prior litigation for the purpose of applying the exception. We are not aware of any Michigan case law which would prevent this Court from ruling that attorney fees may be awarded as exemplary damages in cases such as this where the court finds that a party guilty of wrongdoing acted intentionally, ·requiring a less culpable defendant to defend itself in a suit arising from the same action and necessitating the plaintiff's bringing of such a suit. Furthermore, the intentional tort of conversion, found here, is not unlike actions for false imprisonment and malicious prosecution, where the recovery of attorney fees has been allowed. *Allen, supra,* 78. The trial court's award of exemplary damages is upheld.

Finally, as to defendant Schea's contention that he should not bear the burden of exemplary damages alone, we agree with the trial court's conclusion that the Bank could be found liable for conversion based on a theory of *respondeat superior,* but, as the trial court found, "[t]he Bank never did authorize Schea to indulge in the tactics used in his gaining possession and ultimate disposition of the Rolls". Thus, while the Bank may have been liable for conversion, it was not liable for the malicious conduct of Schea upon which exemplary damages were awarded and Schea alone must bear the burden of those damages.

Plaintiff contends on cross-appeal that the trial court erred in awarding plaintiff judgment for $23,500, the amount which the court found to be the value of the Rolls Royce at the time of conver-

sion. The proper measure of damages in an action for conversion is the fair market value of the item converted at the time of the conversion. *Baxter v Woodward,* 191 Mich 379; 158 NW 137 (1916). However, this Court stated in *Wronski v Sun Oil Co,* 89 Mich App 11, 28; 279 NW2d 564 (1979), *lv den* 407 Mich 863 (1979), as follows:

"There is a doctrine that the measure of damages for conversion of goods that fluctuate in value is the highest value between conversion and judgment, but this has never been applied in Michigan. * * * We do not choose to apply this doctrine in this instance."

Even in stock conversion cases, the plaintiff is entitled only to the highest market value of the stock "between the time of its conversion and the expiration of a reasonable time to enable [the plaintiff] to purchase other shares in the market". *Weaver v Commercial Savings Bank,* 222 Mich 337, 340; 192 NW 578 (1923). In the present case, the conversion of the Rolls and plaintiff's knowledge of the conversion were essentially simultaneous. Plaintiff does not allege that he attempted to purchase another Rolls of similar vintage in order to maintain his investment position; therefore, the measure of damages used by the trial court was correct.

Judgment for plaintiff is affirmed. Costs to plaintiff.