**MICHIGAN NATIONAL BANK,
Counter-Plaintiff and
Third-Party Plaintiff**

v.

**The KROGER COMPANY, Counter-Defendant, and Hamady Brothers Food Markets, Inc. and Aaron Weston, Third-Party Defendants.**

No. 83–CV–8414–DT.

United States District Court,
E.D. Michigan, S.D.

Sept. 20, 1985.

Vacated in part Oct. 9, 1985.

Charles Milne, of Stern, Milmet, Vecchio, Goll & Carnago, P.C., Detroit, Mich., for The Kroger Co.

C. Patrick Kaltenbach, of Braun, Kendrick, Finkbeiner, Schafer & Murphy, Saginaw, Mich., for Michigan Nat. Bank.

Robert Segar, of Dean, Dean, Segar, Hart & Shulman, P.C., Flint, Mich., for Hamady Brothers Food Markets, Inc. and Aaron Weston.

## OPINION AND ORDER

COHN, District Judge.

This case as it now stands involves the claims of Michigan National Bank (Bank) against The Kroger Company (Kroger) and Hamady Bros. Food Markets (Hamady) for expenses and attorney fees incurred by the Bank (i) in defending itself in this case against claims by Kroger it wrongfully performed its duties as escrow agent under a Kroger-Hamady escrow agreement and (ii) in third-party claiming against Hamady in this case as the actual wrongdoer. The Bank premises its claims on Fed.R.Civ.P. 11, equitable principles regarding fee shifting for conducting frivolous or bad faith litigation, a hold-harmless provision in the escrow agreement and principles of contract and tort law regarding attorney fees occasioned by the wrongdoing of a third-party as damages. For the reasons which follow, which constitute the findings of fact and conclusions of law required by Fed.R. Civ.P. 52(a), I find in favor of the Bank against Hamady and against the Bank with regard to Kroger.

### I.

Trial of the Bank's claims was conducted to the bench over four days in April and June of this year. I find as follows:

## A.

On March 3, 1983 Kroger and Hamady in settlement of a lawsuit agreed to unwind the 1980 sale of nine supermarkets sold by Kroger to Hamady by Kroger taking back the markets. Because Kroger did not want to publicly operate the markets for fear of contingent obligations on labor agreements, Kroger and Hamady agreed that Hamady would continue operating the markets until they could be sold by Kroger. As each market was sold Kroger was to receive the sales price for the lease, leasehold improvements and equipment while Hamady was to receive the sales price of the inventory. To protect Kroger, Kroger and Hamady agreed that the sales would be made in escrow. Under the agreement the escrow agent, subsequently named as the Bank, was to take title to the leasehold improvements and equipment on behalf of Kroger and deliver such title as Kroger's nominee to the purchaser. In addition, Kroger would execute an assignment of the lease to the purchaser covering the market premises at closing.

On March 23, 1983 the Bank, Kroger and Hamady entered into an escrow agreement, paragraph 13 of which reads as follows:

"Escrow Agent shall in no case or event be liable for the failure of any of the conditions of the said Escrow Agreement described above or damages caused by the exercise of its discretion on any particular matter or for any other reason except gross negligence or willful misconduct with reference to the escrow, and shall in no event be liable to make any payment hereof, except to the then extent of the funds in its hands."

This paragraph was inserted at the request of the Bank.

The parties contemplated that sales agreements for the markets would be executed by Hamady as the seller and then assigned by Hamady to the Bank. At the closing the Bank would sign and deliver the documents required of the seller, receive the proceeds from the sale, including the amounts paid for the leases, leasehold improvements, equipment and inventory, and then pay over to Kroger and Hamady the amounts due each for their respective interests in the proceeds. While Kroger and Hamady knew the proceeds from the sales of inventories were to be paid to Hamady no special provision was inserted in the escrow agreement to that effect. Likewise nothing in the escrow agreement spelled out that Hamady was to enter into the sales agreements as seller and then assign the seller's interest to the Bank.

The first two markets, both in Muskegon, were apparently sold under sales agreements executed by Hamady as seller, assigned to the Bank by Hamady, and then the sales closed in the manner described above. In anticipation of the closing on the first two markets Kroger wrote the Bank on April 18, 1983 in part as follows:

"The submitted Assignment of Purchase Agreement assigning to Michigan National Bank, Escrow Agent, the Purchase Agreement between Hamady and Plumb is approved.

.     .     .     .     .

The Purchase Agreement calls for Plumb, Inc. to pay $600,000 to Michigan National Bank at closing. . . .

.     .     .     .     .

The documents approved herein may be used in any of the other seven store's sales, as necessary, and do not need to be reviewed by Kroger prior to Michigan National Bank's execution, but Michigan National Bank will be responsible for the various recitations. . . . Any other changes in these forms must be approved by Kroger."

The second two markets were sold under sales agreements which named the Bank as seller. Hamady was apparently not involved in these sales; the record is not clear on the point. Another market was apparently sold directly by Kroger.

The last four markets, located in Alpena, Tawas, Cheboygan and Petoskey, were sold under sales agreements in which Hamady was named as the seller. For reasons not explained, these sales agreements were not assigned to the Bank by Hamady so that

when the sales of the four markets were closed on July 8, 1983 the purchasers were to make their checks payable to Hamady. The sales agreements for these markets were drafted by Hamady's lawyer and sent to the Bank for approval. There is a dispute over whether Kroger saw the sales agreements in draft form in advance of closing. The Bank says they were sent to Kroger in draft form and Kroger approved them. Kroger says it left it up to the Bank to handle the sales and did not see the agreements in draft form. Kroger says further it depended on the terms of the escrow agreement and the letter of April 18, 1983 to protect its interest. I find that the Bank did not prove it was more likely than not that Kroger saw the sales agreements in draft form in advance of closing.

Whether Kroger saw the agreements in draft form is really not that important. Proper execution of an escrow closing certainly requires the documents be in a form which provides that payment be made to the escrow agent and the documents regarding the transaction deposited with the escrow agent be released on receipt of payment. See the definition of "escrow" in Black's Law Dictionary, 5 ed. The Bank as an experienced escrow agent should have known this. The escrow agreement and letter of April 18, 1983 were not as explicit as they might have been on the point. The letter does make clear that Kroger expected that the two Muskegon markets be sold under agreements with Hamady named as seller and thereafter assigned by Hamady to the Bank. However, the Bank certainly had no reason prior to the closing on the four markets to be concerned that Hamady might withhold the amounts it received at closing belonging to Kroger.

On July 8, 1983, on the morning of the closing, Hamady's chief executive called Kroger and attempted to bring to a head a dispute over approximately $200,000 of outstanding items between the two.

These items principally related to Hamady's assertion that Kroger should pay Hamady's attorney for drafting the sales agreements and that Kroger should be responsible for any brokerage on the sales. The Kroger representative to whom Hamady's chief executive spoke was not directly responsible for the matter. He told Hamady's chief executive not to worry because Kroger was not going to take down the proceeds from the escrow immediately and he was sure the items in dispute could be resolved early the following week. Neither Kroger nor Hamady passed this information on to the Bank. As the closing began Hamady's attorney told the Bank's representative that Kroger and Hamady had agreed to leave the proceeds from the sales in escrow until the outstanding items in dispute between them were resolved. The attorney also displayed to the Bank a Hamady check payable to the Bank in the amount due Kroger from the proceeds of the sales of the four stores.

After the sales of three of the markets were closed the Hamady attorney, on the explicit instruction of Hamady's chief executive and contrary to the Kroger-Hamady understanding, confronted the Bank with a request to sign a letter requiring the Bank to specifically agree to hold the amounts due Kroger in escrow until the Kroger-Hamady differences were resolved. After checking with Kroger the Bank's representative declined to sign the letter but with Kroger's approval completed the sale of the fourth market. Hamady withdrew the check it previously displayed and thereupon delivered to the Bank for Kroger's account the proceeds of the sales of the four markets due Kroger less $250,000.

Hamady's chief executive acknowledged at trial that Hamady had no legal right to withhold the $250,000. His only explanation for withholding the $250,000 was his desire to pressure Kroger into settling the items in dispute without a lawsuit. The executive further acknowledged that by July 19, 1983 he should have known that the only broker who could have claimed a commission acknowledged no commission was due; this item potentially involved $160,000. See Appendix.

When the Bank advised Kroger of what occurred at the closing Kroger insisted the

Bank make good the $250,000 and obstinately declined to discuss Hamady's offer to put the $250,000 into escrow with the Bank to abide resolution of the items in dispute. In the period following the closing Kroger produced the necessary documents to reduce the items in dispute to around $75,000. Hamady nonetheless declined to pay over any part of the $250,000. Because of Kroger's insistence that the Bank pursue Hamady for the $250,000 the Bank withheld $50,000 of the amounts due Kroger as security, it said, for its fees and expenses. Lastly, the Bank and Hamady each acknowledge that Kroger was collectible and neither feared that if Kroger was sued there was any danger of a judgment going uncollected.

### B.

On August 19, 1983 Kroger sued the Bank in a three count complaint alleging failure to follow instructions as an escrow agent, wrongful withholding of the $50,000 and negligence. An amended complaint was filed on September 2, 1983 making substantially the same claims. Kroger did not expressly charge the Bank with gross negligence or willful misconduct. Kroger declined to name Hamady as a defendant or charge it with wrongdoing although Kroger was of the opinion Hamady had breached the escrow agreement in withholding the $250,000. The Bank answered Kroger's complaint denying liability and filed a third-party complaint against Hamady. A flurry of pleadings followed.

In November 1983, while various motions by the Bank for summary judgment and to compel Hamady to deposit the $250,000 into court were pending, the parties finally agreed to an arrangement under which Hamady would put the $250,000 in escrow. Because of cash flow problems Hamady did not have the $250,000 available. On or about December 2, 1983, Hamady deposited the $250,000 with the Clerk of the Court. The matters in dispute between Kroger and Hamady were resolved in January 1985 with Kroger apparently prevailing for the most part, leaving only the Bank's claim for its expenses and attorney fees incurred in defending itself against Kroger's claim and in third-party claiming against Hamady pending. Between the filing of the complaint by Kroger and resolution of the Kroger-Hamady dispute a substantial number of pleadings were filed by the parties and significant pretrial activity took place, the nature and significance of which is not altogether clear. Until the trial none of the parties had carefully analyzed the exact sequence of events following the Kroger-Hamady agreement of March 3, 1983 to unwind the original purchase by Hamady of the nine markets and the filing of this case by Kroger.

### C.

Kroger's pre-trial analysis of its legal position vis-a-vis the Bank was rather blunt. The Bank as escrow agent had an obligation to collect the full amount due Kroger before it released any of the documents transferring Kroger's interests in the leases, leasehold improvements and equipment. Since the Bank did not do so it was obligated for the shortfall in payment. Kroger gave no consideration in its analysis to the exculpatory nature of paragraph 13 of the escrow agreement or of the causal effect of Hamady resorting to an egregious form of self-help and likely conversion of Kroger's property to force a settlement of its differences with Kroger. Likewise Kroger gave no consideration to the effect of its willingness to go forward with the closing on the fourth market after it learned of Hamady's intention to withhold the $250,000.

### D.

I bear some responsibility for the legal excessiveness displayed in this case. I held the first status conference on November 1, 1983. By that time some 26 docket entries had been generated. A status conference held immediately after the case was transferred to my docket on August 29, 1983, after the initially assigned judge disqualified himself, might have obviated much of the legal effort displayed in this case. I

could have rightfully urged Hamady to pay over the $250,000 to Kroger or at least deposit it with the Clerk of the Court. And I certainly could have urged the Bank to pay the $50,000 to Kroger. Attorneys have an obligation to alert a judge to such possibilities. Also, if the parties and I had recognized that attempting resolution by summary judgment was simply inappropriate because of the gross disagreement over what occurred, substantially less legal and judicial effort might have been involved. Again attorneys should feel free to suggest to a judge the necessity of a trial under such circumstances.

### III.

#### A.

The Bank argues that it is entitled to attorneys fees from Kroger under the sanction provisions of Fed.R.Civ.P. 11 and equitable principles regarding fee shifting. These are simply not applicable to Kroger's pursuit of the Bank alone or in the manner it conducted itself in this case.

#### 1.

Fed.R.Civ.P. was amended in 1983 to provide an expansive standard for the imposition of appropriate sanctions, including but not limited to the other party's attorney's fees. *Eastway Construction Corp. v. City of New York*, 762 F.2d 243 (2d Cir. 1985). Rule 11 reads in pertinent part:

Every pleading, motion and paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name.... The signature of an attorney constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief ... formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order or pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Prior to the 1983 amendment, the standard for imposing sanctions under Rule 11 was whether the action was commenced in "good faith". *Goldman v. Belden*, 580 F.Supp. 1373 (W.D.N.Y.1984). Rule 11 no longer inquires only into the subjective good faith intent of a party. *Zaldivar v. City of Los Angeles*, 590 F.Supp. 852, 856 (C.D.Cal.1984). Under the rule as amended, a court must examine the objective reasonableness of the claim in light of existing law and facts.

The purposes and limitations of Rule 11 are most clearly explained by the Advisory Committee Notes to the 1983 amendments, reprinted at 97 F.R.D. 198–201 (1983):

Since its original promulgation, Rule 11 has provided for the striking of pleadings and the imposition of disciplinary sanctions to check abuses in the signing of pleadings....

. . . . .

... The new language is intended to reduce the reluctance of courts to impose sanctions, ... by emphasizing the responsibilities of the attorney and reenforcing those obligations by the imposition of sanctions.

The amended rule attempts to deal with the problem by building upon and expanding the equitable doctrine permitting the court to award expenses, including attorney's fees, to a litigant whose opponent acts in bad faith in instituting or conducting litigation. See, *e.g., Roadway Express, Inc. v. Piper*, 447 U.S. 752, [100 S.Ct. 2455, 65 L.Ed.2d 488] (1980); *Hall v. Cole*, 412 U.S. 1, 5 [93 S.Ct. 1943, 1946, 36 L.Ed.2d 702] (1973). Greater attention by the district courts to plead-

ing and motion abuses and the imposition of sanctions when appropriate, should discourage dilatory or abuse tactics and help to streamline the litigation process by lessening frivolous claims or defenses.

. . . . .

The new language stresses the need for some prefiling inquiry into both the facts and the law to satisfy the affirmative duty imposed by the rule. The standard is one of reasonableness under the circumstances....

The rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories. The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted.... The court, retains the necessary flexibility to deal appropriately with violations of the rule. It has discretion flexibility to deal appropriately with violations of the rule. It has discretion to tailor sanctions to the particular facts of the case, with which it should be well acquainted.

... in considering the nature and severity of the sanctions to be imposed, the court should take account of the state of the attorney's or party's actual or presumed knowledge when the pleading or other paper was signed....

If the duty imposed by the rule is violated, the court should have the discretion to impose sanctions on either the attorney, the party the signing attorney represents, or both, ...

Even though it is the attorney whose signature violates the rule, it may be appropriate under the circumstances of the case to impose a sanction on the client....

To assure that the efficiencies achieved through more effective operation of the pleading regimen will not be offset by the cost of satellite litigation over the imposition of sanctions, the court must to the extent possible limit the scope of sanction proceedings to the record. Thus, discovery should be conducted only by leave of the court, and then only in extraordinary circumstances.

The amended rule has achieved at least one of its intended purposes—"to reduce the reluctance of courts to impose sanctions." For examples of the application of the rule, see, e.g., *Eastman Construction Corp., supra; SFM Corp. v. Sundstrand Corp.,* 102 F.R.D. 555 (N.D.Ill.1984); *Mohammed v. Union Carbide Corp.,* 606 F.Supp. 252 (E.D.Mich.1985). See generally Schwarzer, *Sanctions Under the New Federal Rule—A Closer Look,* 104 F.R.D. 181 (1985); W. Hardy, *Decisions, Opinions and Orders Imposing Sanctions Under the Federal Rules of Civil Procedure in the Sixth Circuit,* 34–49 (June 15, 1985) (report prepared at the behest of the American Bar Association Section on Litigation).

2.

The equitable rule regarding fee shifting for bad faith or frivolous conduct of a case is explained in *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 765–66, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1980) as follows:

> Of course, the general rule in federal courts is that a litigant cannot recover his counsel fees. See *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. [240 (1975)] at 257 [95 S.Ct. 1612 at 1621, 44 L.Ed.2d 141]. But that rule does not apply when the opposing party has acted in bad faith. In *Alyeska,* we acknowledged the "inherent power" of courts to "assess attorneys' fees for the 'willful disobedience of a court order ... as part of the fine to be levied on the defendant.... or when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons....' ....

The bad-faith exception for the award of attorney's fees is not restricted to cases where the action is filed in bad faith. " '[B]ad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation." *Hall v. Cole,* 412 U.S. 1, 15 [93 S.Ct.

1943, 1951, 36 L.Ed.2d 702] (1973). See *Browning Debenture Holders' Comm. v. DASA Corp.*, 560 F.2d 1078, 1088 (CA2 1977)...."

(citations omitted in part). See also *Shimman v. International Union of Operating Engineers, Local 18*, 744 F.2d 1226 (6th Cir.1984).

### B.

#### 1.

While it would have been preferable for Kroger to specifically allege gross negligence or willful misconduct on the part of the Bank, tracking the language of paragraph 13 of the escrow agreement, Kroger had a right to sue the Bank for wrongful execution of its obligations as an escrow agent. The record of the prefiling analysis by the Kroger's lawyers of Kroger's right to sue the Bank while perhaps a bit rigid in not concluding that Hamady should be a party to the case, shows a careful and deliberate consideration of the appropriate manner of framing the complaint and proceeding in the case.

#### 2.

■ The Bank as an escrow agent fell short of the proper standards for the performance of its duties as an escrow agent in a variety of ways:

First, the Bank failed to obtain an assignment of the four sales agreements which Hamady signed as seller. The record shows that in March 1983 Hamady specifically assigned to the Bank Hamady's interest in the leasehold improvements and equipment for the Alpena market. This, incidentally, is the only document of its kind in the record. Allowing Hamady to sign as seller for this market was inconsistent with the assignment. Moreover, the settlement agreement of March 3, 1983 between Kroger and Hamady specifically provided that Hamady was "to tender market title to nine store locations ... to the escrow agent ... for the purpose of selling...."

Second, each of the sales agreements provided by its terms that the purchase price was to be "deliver[ed] to Seller" so that the Bank could not control the monies due Kroger at closing.

Third, the Bank withheld $50,000 of Kroger's money "to cover any expense it incurs related to your request that it pursue collection of the withheld $250,000" contrary to the terms of the escrow agreement and its responsibilities as a fiduciary.

On July 19, 1983 Kroger directed the Bank to transfer the monies it was holding in escrow from the sale of the eight markets. Kroger obtusely asked for "the total sales price" for Alpena, Tawas, Cheboygan and Petoskey well knowing Hamady had withheld $250,000 of such amounts. A second letter demanded the Bank deposit $250,000 into the escrow account for transferring title to the four stores in violation of its fiduciary duties, Kroger's instructions and the escrow agreement. On July 28, 1983 the Bank responded to Kroger denying it had violated any of its obligations and describing the reasons for withholding the $50,000. The reasons lack any merit since the Bank, as previously noted, knew Kroger was fully collectible for a legitimate obligation.

Fourth, the Bank declined Hamady's offer made a few days after July 8, 1983 to put the $250,000 in escrow to abide resolution of the Kroger-Hamady dispute. It is surprising that at no time did the Bank consider interpleader as a solution to its problems as escrow agent. Kroger's attitude about putting the $250,000 in escrow is also surprising in light of Kroger's acknowledgement that it had a concern over Hamady's solvency. The failure of Kroger to agree to an escrow for the $250,000, however, does not excuse the Bank's conduct, or invoke paragraph 13 of the escrow agreement. The Bank may not bootstrap its position by Kroger's rigidity.

Lastly, the Bank knew Kroger distrusted Hamady and was utilizing the escrow arrangement to avoid further difficulties with Hamady. The Bank's conduct of its responsibilities as an escrow agent flew in the face of this knowledge.

**3.**

I am satisfied Kroger appropriately named the Bank in its complaint and conducted itself appropriately. The Bank must, as against Kroger, pay its own expenses and attorney fees. *Aleyska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1975).

**IV.**

**A.**

■ The Bank's case against Hamady has merit. Hamady breached the escrow agreement by failing to pay over to the Bank as escrow agent for Kroger's account the proceeds of the sales of the leases, leasehold improvements and equipment in the four markets Hamady's breach of the escrow agreement caused the Bank to incur expenses and attorney fees in defending against Kroger's claims and in pursuing Hamady under Fed.R.Civ.P. 14(a). Hamady's argument that there is nothing in the escrow agreement or its conduct which supports the Bank's position ignores the following:

First, Hamady had no right to withhold the $250,000 at the closing. The $250,000 was not its money. Withholding the $250,000 to put pressure on Kroger to settle the dispute over who was responsible for attorney fees and commission was no more than financial blackmail on Hamady's part. Hamady's chief executive acknowledged this.*

Second, Hamady put the $250,000 into its general account and used it for its general corporate purposes. In November 1983 when Hamady finally agreed to deposit the $250,000 with the Clerk of the Court it lacked sufficient funds to do so.

Third, Hamady ignored the effect withholding the $250,000 would have on the Kroger Bank relationship and the embarrassment it would cause the Bank. Hamady's chief executive acknowledged this.

Fourth, Hamady was aware the Bank had a fiduciary obligation towards Kroger

regarding the proceeds from the sales belonging to Kroger and know or should have known that likelihood of the Bank becoming embroiled in litigation because of its withholding the $250,000.

Fifth, by July 19, 1983 Hamady knew that $160,000 of the items in dispute were resolved. Hamady's chief executive acknowledged that he should have known this.

Hamady's conduct and the manner of its handling this case implicates both Fed.R. Civ.P. 11, and the equitable rule on fee shifting conduct discussed in Part § III.A., *supra*, as well as tort liability for attorney's fees, discussed *infra*.

**B.**

On September 7, 1983 the Bank filed a third-party complaint (Docket # 4) against Hamady alleging Hamady withheld the $250,000 wrongfully and was the cause of Kroger's claim against the Bank. Specifically the Bank claimed indemnification, breach of the escrow agreement, fraud and misrepresentation, conversion, and asked for a judgment against Hamady for $250,000 plus its reasonable attorney fees. Hamady answered on October 14, 1983 (Docket # 14) stating that the escrow agreement required only the net proceeds to be deposited with the Bank after payment of expenses, and that it withheld the $250,000 for the reason that Kroger expressly agreed to retain the proceeds in escrow pending payment of the expenses and then refused to honor its agreement. In a later pleading (Docket # 50) Hamady explained that it retained the $250,000 to cover potential expenses of Hamady resulting from its performance under the escrow agreement. On November 1, 1983 the Bank filed a motion to deposit the $250,000 into escrow (Docket # 21), a motion for partial summary judgment for $145,410.46 on the grounds at most $94,589.54 was in dispute (Docket # 24) and for partial summary judgment for the $250,000 (Docket # 25). Hamady's answers and affidavits in re-

* The testimony of Hamady's chief executive is    excerpted in the Appendix to this opinion.

sponse (Docket ## 34–39) asserted generally the same grounds as its answer to the complaint. Hamady never specifically responded to the allegation that only $94,-589.54 was still in dispute.

Nowhere in the record does Hamady offer any support for the proposition that, assuming Kroger initially agreed on July 8, 1983 to leave its money in escrow with the Bank to abide settlement of the disputed items, it had the right to withhold the $250,000 when the Bank's representative declined to sign a letter to that effect. Indeed, Hamady could not legitimately make that argument since it had no right in the first place to make the request. Also, by the time Kroger filed suit against the Bank at most about $90,000 was in dispute and, even as to that amount, if Kroger was obligated for any part of the attorney fees it certainly was collectible.

I find that Hamady's pleadings and the conduct of its defense were frivolous. Hamady's defense was for the purpose of delaying having to pay over the $250,000. Hamady's defense was not well grounded in fact; it was not warranted by existing law. Hamady made no real attempt either factually or legally to justify the retention of the $250,000. It simply used the $250,-000 for general corporate purposes. There was a violation of Fed.R.Civ.P. 11 justifying imposition of sanctions on both Hamady and its attorney. The Bank is also entitled to the benefit of the equitable rule regarding fee shifting as explained in Part III.A., *supra*.

### C.

#### 1.

While the Bank may have been liable to Kroger for the failure to properly execute its responsibilities as escrow agent, such failure was proximately caused by Hamady's breach of the agreement of March 3, 1983 and the escrow agreement of March 23, 1983 by not assigning the sales agreements for the four markets to the Bank, by taking payment in its own name of the total proceeds of the sale of the four markets and by failing to turn over the $250,-000 to the Bank. The Bank's inability to turn the $250,000 over to Kroger was also proximately caused by Hamady's converting the $250,000 belonging to Kroger to its own uses. Hamady is therefore liable to the Bank for the expenses and attorney fees incurred by the Bank in defending against Kroger and in pursuing Hamady.

#### 2.

The Restatement of Contracts, § 334 *Expenses of Litigation Caused by Breach of Contract* reads:

"If a breach of contract is the cause of litigation between the plaintiff and third parties that the defendant had reason to foresee when the contract was made, the plaintiff's reasonable expenditures in such litigation are included in estimating his damages."

The Restatement of Torts, 2nd, § 914(2) *Expenses of Litigation* reads:

(2) One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.

Whether Hamady is contractually obligated to the Bank or obligated in tort is not significant. The fact is that the Bank was really involved in two separate cases. In the first, it was defending against Kroger's claims for wrongful performance as an escrow agent and in pursuing Hamady. The second case involves the Bank's claim against Hamady for its expenses and legal fees in the first case caused by Hamady's withholding the $250,000.

In *Prentice v. North American Title Guaranty Corporation, Alameda Division,* 59 Cal.2d 618, 30 Cal.Rptr. 821, 381 P.2d 645, 647 (Cal.1963), the court said:

In this case we are not dealing with "the measure and mode of compensation of attorneys" but with damages wrongfully caused by defendant's improper actions.

In *State Farm Mutual Automobile Insurance Company v. Allen*, 50 Mich.App. 71, 78–79, 212 N.W.2d 821 (1973) the court said:

As explained by McCormick, Damages, § 66, p. 246:

"For the expenses incurred in the *present* litigation, we have found that our law generally gives the successful party no recompense beyond the taxable costs which ordinarily include only a portion of his expense. This is the case, however wrongful the suit or groundless the defense. On the other hand, where the present defendant has by his wrongful conduct, be it tort or breach of contract, caused the present plaintiff to defend or prosecute *previous* legal proceedings, the law reverses its restrictive attitude and allows the plaintiff to recover all the expense, including counsel fees, reasonably incurred by him in the prior litigation." (Emphasis by author.)

The fact that the "prior action" is tried with the action in which the legal expenses are claimed has no significance. *Dassance v. Nienhuis*, 57 Mich.App. 422, 225 N.W.2d 789 (1975), *Larson v. Van Horn*, 110 Mich. App. 369, 313 N.W.2d 288 (1981). In *Larson* the court said 110 Mich.App. at 384, 313 N.W.2d 288:

As found in *Allen*, the fact that a number of claims are brought in a single lawsuit does not mean that he or some of the claims cannot be considered prior litigation for the purpose of applying the exception. We are not aware of any Michigan case law which would prevent this Court from ruling that attorney fees may be awarded as exemplary damages in cases such as this where the court finds that a party guilty of wrongdoing acted intentionally, requiring a less culpable defendant to defend itself in a suit arising from the same action and necessitating the plaintiff's bringing of such a suit.

Also to the point is the comment in *Manning v. Sifford*, 111 Cal.App.3d 7, 168 Cal. Rptr. 387, 388 (Ct. of App.1980):

"[The] appeal require[d] resolution of one issue: is an agent who is required to bring a cross action against a wrongdoer who caused injury to the principal entitled to recover attorney's fees for helping to successfully secure redress against that wrongdoer" and "answere[d] [the] question affirmatively."

See also Annotation, *Attorney Fees Incurred In Litigation With Third Person As Damages In Action For Breach of Contract*, 4 A.L.R.3rd 270 and 22 Am. Jur.2d, *Damages* § 166—*Litigation against third person as result of defendant's wrongful act.*

## V.

Because I previously bifurcated the issues of liability and damages, Fed.R.Civ.P. 42(b), I did not deal at trial with the appropriate dollar amount of the Bank's expenses and attorney fees. The Bank is not entitled to total reimbursement because of its withholding of the $50,000 and perhaps the excessiveness in its manner of conducting this case. See *United Food & Commercial Workers Union Local 115 v. Armour and Company*, 106 F.R.D. 345, 348–50 (N.D.Cal.1985) (although Rule 11 is intended to ensure that victims of frivolous litigation do not pay expensive legal fees, parties have a duty to mitigate by attempting to resolve legal claims using the least expensive alternatives). Also, the Bank has not focused on whether Hamady should be responsible for the expenses and attorney fees or the attorney who signed the pleadings, or both. In *Mohammed, supra*, the court imposed joint and several liability, 606 F.Supp. at 262. That form of order would be inappropriate here. Additionally, while Fed.R.Civ.P. 11 provides for the imposition of attorney fees, and the Advisory Committee notes indicate that either the offending party or the attorney may be liable, Fed.R.Civ.P. 11 is not a fee shifting mechanism; it is a form of punishment and works to modify behavior. *Schwarzer, supra*, 104 F.R.D. at 201.

Under the circumstances which obtain here I am satisfied Hamady bears the

major responsibility. Its chief executive is a sophisticated businessman; he made the decision to withhold the $250,000. Hamady used this money for 5 months for its general corporate purposes. Extended judicial effort should not be required in this kind of satellite litigation; "the costs of sanction litigation can exceed the efficiencies sought by the Federal Rules, and thus [the district court should] ... limit the scope of its proceedings accordingly." *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1179 (D.C.Cir. 1985). Hamady's attorney, is, therefore, SANCTIONED in the amount of $2,000 to be paid to the Bank and $500 to be paid to the Clerk of the Court. The balance of the amounts to be paid to the Bank are Hamady's exclusive responsibility.

The Bank shall file an itemized statement of its expenses and attorney fees incurred in this case to date within 20 days describing in detail the matters involved and the hourly rates. The Bank should make an initial allocation between the effort in resisting Kroger's claim for the $50,000 and the balance of its efforts. Hamady cannot be held responsible for the decision to withhold the $50,000. Hamady shall have 20 days in which to respond. I will hold a further hearing on Thursday, October 24, 1985 at 2:00 p.m. Some further effort at resolution or at least stipulations are certainly in order.

SO ORDERED.

APPENDIX

Excerpts from testimony of Alex Dandy, chief executive officer of Hamady, April 25, 1985 at 3–18.

Cross examination by Mr. Kaltenbach:

Q. Now, before today, you told me that you had no particular reason to withhold the $250,000.00 when you, in fact, did it on the day of this closing; isn't that true?

     \*     \*     \*     \*     \*     \*

A. I may have, sir, yes.

     \*     \*     \*     \*     \*     \*

THE COURT: The question is, did Hamady on July 8th take the $250,000.00 for itself?

A. Yes.

     \*     \*     \*     \*     \*     \*

THE COURT: The question is, it was not segregated and separately identified as not being Hamady's?

A. No, sir.

     \*     \*     \*     \*     \*     \*

THE COURT: Let me ask you this, Mr. Dandy, just to simplify this point.

Mr. Weston has testified, I believe, I could be wrong, that at some time in August, when it was suggested that the $250,000.00 be put in an escrow account, that Hamady could not do that because it did not have the funds aviailable at that time. Would you say that he was correct, that there came a point in time in August when the CD's bank balances of Hamady fell below $250,000.00, so Hamady could not immediately take and put $250,000.00 into escrow, if you know?

A. Yes, the answer is yes.

     \*     \*     \*     \*     \*     \*

Q. There was no commission which was to be paid to Hamady; correct?

A. Not that I know of.

     \*     \*     \*     \*     \*     \*

Q. Other than Mr. Wisinski, you were not aware of anyone else who was entitled to a commission?

A. Not that I know of.

     \*     \*     \*     \*     \*     \*

Q. Let's assume for a moment that that letter was sent to your counsel, and a request was made that the $166,000.00, which you claimed you were holding for the purpose of paying Mr. Wisinski, let's assume for a moment that that was still being held by you, is that correct, is was being held by you at that time in July?

     \*     \*     \*     \*     \*     \*

A. Yes.

     \*     \*     \*     \*     \*     \*

Q. Why didn't you turn the money over at that time once you received the letter and were aware that there was no claim against you or anyone else for a broker's commission?

A. I don't remember seeing that letter. This is the first time I ever saw that letter.

Q. If you had seen that letter, however, at that time, would there have been any reason for you not to turn over the $166,000.00 to the bank?

A. No reason whatsoever.

\* \* \* \* \* \*

Q. Another way of saying it, at that time, you agreed that the money could be turned over to the Court, you didn't have the money to turn over; correct?

A. I think we had some cash flow problems at that moment.

\* \* \* \* \* \*

THE COURT: The anser is, yes, he didn't have the money....

\* \* \* \* \* \*

Q. Mr. Dandy, when you were aware of differences which you had with Kroger preceding the closing and you testified that you knew about those differences ten days to two weeks before the closing, did you happen to either tell the escrow agent directly about these problems that you could foresee would happen at the closing, or did you tell Mr. Weston and tell him to tell the escrow agent?

A. I didn't tell him to tell anybody. I told him we had these problems.

Q. Did you ever think to tell Michigan National about the problems?

A. I didn't know who to talk to there. I just talked to Mr. Weston, sir.

Q. Did you happen to tell him to tell the Bank about the problems?

A. I don't remember, sir.

\* \* \* \* \* \*

Examination by the Court:

THE COURT: So, therefore, the $250,-000.00 that was withheld represented a portion of the payment by the purchaser on the fixtures and equipment?

A. Yes, sir.

THE COURT: And, in addition, there was money that Hamady alleged that Kroger owed it that was on the commission, on the inventory adjustment and attorney fees?

A. Correct.

THE COURT: And Kroger didn't acknowledge that it owed it, did it?

A. That's right, yes, sir.

THE COURT: So, you just engaged in what I guess we would call "self-help", you took money that came into your hands that belonged to Kroger, that represented payment to Kroger for fixtures and equipment, and you simply refused to remit it to Kroger because you had a dispute with Kroger, and that was a form of self-help, you didn't have a judgment against Kroger, did you?

A. No, sir.

THE COURT: And you didn't have any instrument that said Kroger owes Hamady $250,000.00, did you?

A. No, sir.

THE COURT: You just sort of took the $250,000.00 and figured you had a club over Kroger's head, because, by you withholding it, Kroger would have to come to you to account, rather than you account to Kroger or you sue Kroger; right?

A. I was trying to avoid a suit.

THE COURT: You just answer my questions, if you can.

A. Yes.

THE COURT: You simply used this as a club; is that a fair way of my looking at it?

A. The answer is yes, your Honor.

\* \* \* \* \* \*

THE COURT: Kroger, in your judgment, was an uncollectible, or was it in a precarious financial condition, or did you have any doubt that if you sued Kroger and obtained a judgment, they would not be able to pay it?

A. No, they are collectible, your Honor.

\* \* \* \* \* \*

THE COURT: You are familiar, are you not, that a bank, when it acts as a fiduciary, has certain obligations?

A. Yes, sir.

THE COURT: And are you aware, sir, or are you of the opinion that if a bank violates its fiduciary obligations that it can affect its reputation in the marketplace?

A. Yes, sir, I understand that.

THE COURT: And that a bank which holds money as an escrow agent, you correct me if I am wrong, whether you acknowledge this or not, a bank which is obligated to hold money as an escrow agent and does not fulfill that obligation may be embarrassed in the marketplace?

A. It could be very much.

### ORDER VACATING ORDER OF SEPTEMBER 20, 1985 IN PART

In the Opinion and Order of September 20, 1985 the Court imposed a $2,500 sanction under Fed.R.Civ.P. 11 on the attorney for Hamady Bros. Food Markets to be paid to Michigan National Bank and the Clerk of the Court for reasons explained in Part IV B and Part V of the Opinion. On October 2, 1985 the attorney for Hamady filed a Motion to Vacate Portion of Order or in the Alternative, Motion for Reconsideration on the grounds the attorney had not been heard on the question of sanctions, citing the Advisory Committee Notes to the 1983 amendment to the Federal Rules of Procedure in 97 F.R.D. 198, 201 (1983) stating due process is implicated in the imposition of sanctions. While the Court is satisfied the parties and their attorneys knew or should have known what was at risk at the hearings on the claims of Michigan National Bank, to obviate any doubts the part of the Order of September 20, 1985 imposing the sanction on the attorney is VACATED. The Court will consider the allocation of the amount to be paid to Michigan National Bank at the scheduled October 24, 1985 hearing. If the matter is resolved by the parties, the question of sanctions will be moot.

SO ORDERED.