UNITED STATES of America, Plaintiff,

v.

SIXTY THOUSAND DOLLARS ($60,-000.00) IN UNITED STATES CURRENCY, Defendant.

No. 90–71185.

United States District Court,
E.D. Michigan, S.D.

April 23, 1991.

Stephen J. Markman, U.S. Atty. by John C. Engstrom, Asst. U.S. Atty., Detroit, Mich., for plaintiff.

Raymond R. Burkett, Detroit, Mich., for defendant.

MEMORANDUM OPINION AND ORDER GRANTING THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

GADOLA, District Judge.

### FACTUAL ALLEGATIONS

The government alleges that on April 24, 1989, at approximately 4:40 p.m., claimant

Kenneth Holmes was observed by Task Force Agent Terry Saunders arriving at Detroit Metropolitan Airport. Gilbert Dep. at pp. 17–18. The government claims Holmes was dropped off at the airport by an unknown male and was carrying one piece of carry-on luggage. The government alleges that Agent Saunders immediately observed large bulges in Holmes' coat pockets, as well as in the left pocket of his pants.

The government claims that Holmes did not stop at the ticket counter, but instead proceeded directly through security to the "F" concourse. Also, the government claims that based upon Agent Saunders' and Agent Gilbert's experiences, they know that drug couriers often purchase tickets in advance to avoid surveillance at the ticket counter. Gilbert Dep. at p. 28.

Agent Saunders described Holmes as wearing a matching running suit, a white baseball cap, and what appeared to be expensive, "gaudy" jewelry, specifically, at least three gold chains, two with gold pendants, a large gold bracelet, studded with what appeared to be diamonds, a gold watch, and a gold, diamond-studded ring, that appeared to stand up an inch above his finger and was very noticeable. *See* Exhibit A to government's brief.

As Holmes passed through security, the agents allege that they observed him looking around from left to right. After stepping on a motorized walkway, Holmes looked back at Agent Saunders and Agent Gilbert no less than three times. *See* Exhibit A to government's brief and Gilbert Dep. at pp. 29–30. Shortly after Holmes entered the "F" concourse, Agents Saunders and Gilbert initiated a police/citizen contact with him. Both agents were dressed in plain-clothes and identified themselves by showing credentials. Agent Saunders asked if Holmes would talk to him, and Holmes agreed.[1]

Holmes agreed to show the agents his plane ticket, which was an open, round-trip ticket from Washington National Airport to Detroit and back, purchased with cash at Washington National. Gilbert Dep. at pp. 31–32. The government claims that the agents knew from their experience that Washington, D.C. is a major source city for cocaine.[2]

The government alleges that Agent Saunders asked Holmes why he was in Detroit, and he initially explained that he was in Detroit to expand the family business. The agents claim that when asked what type of business he was in, Holmes stated he was self-employed. The agents further allege that when asked what kind of work he did, Holmes answered that he was in the family business. Finally, the agents claim, when asked again Holmes stated that his family owned a hair salon. However, when asked, Holmes could not provide the name of the business or produce a business card. Gilbert Dep. at pp. 32–36.

The government alleges that as Agent Saunders asked Holmes questions about his business, the agents both noted that Holmes became more nervous; specifically, he licked his lips continually, looked down at the floor avoiding eye contact with the agents, and began shuffling his feet and shifting his weight. The vague answers and nervous behavior further suggested to the agents that Holmes was being evasive. Gilbert Dep. at pp. 36–38. Also, the government claims that as the agents talked to Holmes they were able to observe closely the bulges that Agent Saunders had already noticed in Holmes's pockets; specifically, Agent Saunders noted that the left pocket of Holmes's pants contained a folded bundle of money, with a twenty dollar bill on the outside. *See* Exhibit A to government's brief.

---

**1.** Agents Saunders and Gilbert both explained in deposition that a police/citizen contact is a voluntary encounter and not a stop. Had Holmes not agreed to talk with the agents, the encounter would have ended. Gilbert Dep. at p. 31.

**2.** Agent Gilbert described a "source city" in his deposition as a "landing place for drugs to be placed elsewhere." Gilbert Dep. at p. 13. He further explained that Detroit is a "user city," in that more drugs are transported into Detroit than out. Other source cities include Miami, New York City and Los Angeles.

Agent Saunders explained to Holmes that he and Agent Gilbert were looking for narcotics and narcotic-related proceeds, and asked if he would consent to a search of his bag and person. Holmes did not consent. Agent Saunders then explained that there was a narcotics trained dog at the airport that could sniff the bag, and Holmes agreed to allow the dog to sniff his bag. Gilbert Dep. at pp. 38–39.

While waiting for the dog to arrive, agent Gilbert ran a criminal computer check on Holmes which revealed that Holmes had been convicted of burglary in Michigan, and had been arrested on other occasions for a weapons offense and homicide. The government claims the agents then asked Holmes if he had ever been arrested for a felony, and Holmes replied that he had not. When confronted with his arrest record, Holmes admitted that he had been arrested, but stated that he had never been convicted. *See* Exhibit A to government's brief. This was untrue, as Holmes had been convicted for burglary.

Shortly thereafter, agent Gregg Morris arrived with Cora, a dog trained to detect the scent of cocaine, heroin and marijuana. Agent Morris explained to Holmes the procedure by which the dog identifies items with the scent of drugs. The government alleges that Holmes again agreed to allow the examination and carried his bag from the "F" concourse to an unclaimed baggage area. Holmes then placed his bag among 25 to 30 unclaimed bags. The government alleges that when Cora was allowed to search the area, she scratched and bit only at Holmes' bag, pulling it away from the other bags. Agent Morris advised Holmes that Cora had alerted positively to the scent of narcotics on or in Holmes' bag. Holmes' bag was seized at this time, and he was advised that the agents would seek a search warrant for the bag. Holmes then explained to the agents that he was actually in the entertainment business, and he had been to places where

the scent of narcotics may have gotten on his clothes. Gilbert Dep. at p. 41; and Exhibit A to government's brief.

Holmes accompanied the agents to the DEA office where they prepared an affidavit for a search warrant. The government alleges that while at the office, Holmes admitted that there was money in the bag. The government further claims that he then stated that he was a "go-between" for another person (whom he would not name) and a Jaguar dealer in Virginia. Holmes showed the agents a receipt from Rosenthal Imports, dated April 11, 1989, for $5,000. A call was placed to the dealership; and it was learned that the $5,000 receipt reflected a down-payment on a new Jaguar, with a balance of approximately $55,000, that was to be titled to Kenneth Holmes. Gilbert Dep. at pp. 43–45.

A search warrant for the bag was subsequently authorized by Magistrate Marcia Cooke, and the bag was searched for narcotics and narcotics related proceeds. *See* Exhibit B to government's brief. The defendant $60,000 was seized from the bag, and the remaining contents were returned to Holmes via U.S. mail.[3]

After this action was commenced, interrogatories and a document production request were served on claimant. Claimant did not respond, and a motion for sanctions and to compel answers was filed. Claimant did not respond to the motion, and his counsel did not appear at the hearing before Magistrate Goldman. Consequently, an order compelling answers to interrogatories and ordering sanctions was entered against claimant. *See* Exhibit D to government's brief. On September 6, 1990, claimant's counsel forwarded unsigned answers to interrogatories and a number of documents to the United States.

In his answers to interrogatories, claimant indicates that he is a self-employed gambler. He attached his federal tax returns for the years 1987 through 1989, for

---

**3.** Thirty-one pieces of jewelry were also seized as narcotics proceeds, and subsequently forfeited administratively by the Drug Enforcement Administration. The jewelry had an appraised retail value of $46,558 and a wholesale value of $23,279. *See* Exhibit C to government's brief. Mr. Holmes never sought to contest the forfeiture of the jewelry, instead contesting only the forfeiture of the currency.

which years Holmes declared gambling receipts of $65,000, $54,000 and $59,832, respectively. Holmes declared no other income. *See* Exhibit E to government's brief.

Deri Mitchell, the accountant who prepared Holmes' 1989 tax return, was deposed on January 16, 1991. Mr. Mitchell brought along his working file to the deposition. His file did not contain any documentation whatsoever for the alleged income and expenses declared on Holmes' 1989 return. Further, Mr. Mitchell admitted that he does not know whether Kenneth Holmes actually made any money from wagering: "I can only go by what he tells me, sir." Mitchell Dep. at pp. 42–43.

Mr. Holmes was also deposed on January 16, 1991. Holmes refused to respond substantively to any questions, other than a request for his name, instead reading the following prepared statement:

> I, Kenneth Holmes, after consulting with my attorneys and after being present at the depositions of the DEA agents and after hearing the agents testify that they know of no relationships I have to any drug dealings whatsoever and being convinced that the government cannot establish probable cause of any elicit drug activities on my part, I view this deposition as a form of harassment and designed to cover up the illegal actions of the DEA agents seizing my property to build up a criminal case against me. I, therefore, respectfully refuse to answer any questions posed by the U.S. attorney unless counsel is willing to grant me immunity on the subjects talked about as answering any questions may prove grounds to try and incriminate me in other actions.

Holmes Dep. at pp. 5–7.

On February 15, 1991, the government moved for summary judgment. Claimant responded on March 11, 1991, and the government replied on March 28, 1991. Upon this court's request, the government filed a supplemental reply brief on April 12, 1991. Oral argument was heard on April 18, 1991. Having reviewed the pleadings, heard oral argument and being otherwise familiar in the premises, the court will dispose of the instant motion with this written opinion.

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." [Citation omitted]. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984) (quoting Black's Law Dictionary 881 (6th Ed.1979)). The Court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). The initial burden on the movant is not as formidable as some decisions have indicated. The moving party need not produce evidence showing the absence of a genuine issue of material fact: rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific

facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg*, 801 F.2d at 861.

█ To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249–50, 106 S.Ct. at 2510–11. (Citations omitted); *See Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed.R. Civ.P. 50(a). *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact.

### ANALYSIS

█ In his response at p. 9, claimant makes the following arguments:

> The silence of the Claimant is irrelevant to his motion since no case cited can show any adverse inference made at a summary disposition stage. More importantly, no statement needed to be make by Claimant since probable cause was not shown by the Government. However, if one still wishes to draw such an inference, Exhibit A diffuses any such argument. Further, the failure to testify at the deposition does not preclude Mr. Holmes' testimony at the trial.

In its reply at p. 2, the government stated as follows:

> Although claimant attached a conclusory affidavit on his behalf with his brief, the affidavit should be disregarded because claimant refused to answer any questions at his deposition, asserting his fifth amendment privilege against self-incrimination. Claimant suggests in his Brief that his refusal to testify at deposition "does not preclude [his] testimony at the trial." This is false. If claimant were allowed to change his strategy at this time, after discovery has been closed, the government would be precluded from conducting legitimate discovery.

The court believes that the claimant may not now testify at trial or factually oppose the government's motion for summary judgment. *Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir.1989) is directly on point. In *Cartagena*, one of the defendant officers, Pedro Soto, appeared for his deposition but refused to answer any questions about the shooting on the basis of a fifth amendment claim. The trial court granted a motion brought by the plaintiff barring Soto's testimony at trial if he asserted such a privilege during discovery. *Id.* at 576. On appeal, the court discussed the issue as follows:

> In his motion for reconsideration of the order granting plaintiff's motion in limine, and on appeal, Soto takes the position that he should not have to choose between asserting his fifth amendment privilege during discovery and testifying at trial.
>
> Plaintiff contends, and the district court apparently agreed, that it would be an abuse of the fifth amendment to allow Soto to claim the privilege against self-incrimination during discovery and concurrently subject plaintiff to the possibility that at the eleventh hour he might waive the privilege and testify at trial. This, plaintiff asserts, would unduly hamper his preparation for trial.
>
> Trial courts have broad discretion in fashioning remedies during discovery. *See National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643, 49 L.Ed.2d 747, 96 S.Ct. 2778 [2781] (1976). Discovery sanctions are appropriate "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those

who might be tempted to such conduct in the absence of such a deterrent." *Id.* The viewpoint of National Hockey League was echoed in the advisory committee note to the 1983 amendment of Fed.R.Civ. p. 26: "Rule 26(g) is designed to curb discovery abuse by explicitly encouraging the imposition of sanctions." Courts have not been afraid to bar a party from testifying where doing so was necessary to prevent the "thwarting [of] the purposes and policies of the discovery rules." *Meyer v. Second Judicial Dist. Court. etc.*, 95 Nev. 176, 591 P.2d 259 (1979); *see Lyons v. Johnson,* 415 F.2d 540, 541–42 (9th Cir.1969), *cert. denied,* 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970).

The district court's decision to bar Soto from testifying at trial due to his previous refusal to testify during discovery is supported by ample precedent. The Federal Rules contemplate that there be "full and equal mutual discovery in advance of trial" so as to prevent surprise, prejudice and perjury. "It is an effective means of detecting and exposing false, fraudulent, and sham claims and defenses." 4 Moore, Federal practice para. 26.-02[2] at 1034–35. The court would not tolerate nor indulge a practice whereby a defendant by asserting the privilege against self-incrimination during pre-trial examination and then voluntarily waiving the privilege at the main trial surprised or prejudiced the opposing party.

*Duffy v. Currier,* 291 F.Supp. 810, 815 (D.Minn.1968); *accord Rubenstein v. Klevan* [*Kleven* ], 150 F.Supp. 47, 48 (D.Mass.1957), *aff'd* on other grounds, 261 F.2d 921 (1st Cir.1958) (defendant's claim of privilege during deposition precluded his testimony as to certain evidence at trial); *Costanza v. Costanza,* 66 N.J. 63, 328 A.2d 230, 232 (1974); *see also Bramble v. Kleindienst,* 357 F.Supp. 1028, 1035 (D.Colo.1973) (applying same sanction to a plaintiff), *aff'd,* 498 F.2d 968 (10th Cir.1974), *cert. denied,* 419 U.S. 1069 [95 S.Ct. 656, 42 L.Ed.2d 665] (1974); 8 C. Wright & A. Miller, Federal Practice and Procedure @ 2018, at 149 (1970) ("[If] a party is free

to shield himself with the privilege during discovery, while having the full benefit of his testimony at trial, the whole process of discovery could be seriously hampered."). We find these cases persuasive.

\* \* \* \* \* \*

Soto made his decision not to give deposition testimony on August 24, 1987 and held that position throughout the next six months \* \*70] prior to trial. The district court's decision to bar Soto's testimony did not burden his due process rights, it merely forced him to abide by his decision and protected plaintiff from any unfair surprise at trial. A defendant may not use the fifth amendment to shield herself from the opposition's inquiries during discovery only to impale her accusers with surprise testimony at trial. *See Bramble v. Kleindienst,* 357 F.Supp. at 1035–36 (citing *Lyons v. Johnson,* 415 F.2d at 541–42).

Moreover, during oral argument, counsel for Mr. Holmes conceded that, in light of Holmes's assertion of his constitutional privilege against self-incrimination, he cannot testify at trial in opposition to the government's claim. This matter was scheduled to go to trial within two weeks of the date of oral argument on this motion. Because claimant has asserted a fifth amendment claim in discovery, this court holds that he may not now waive the privilege and testify. Neither may he submit affidavits in opposition to the government's motion for summary judgment. That being the case, the government need establish only its initial burden of showing that there was probable cause to believe that the defendant currency was subject to forfeiture under 21 U.S.C. § 881(a)(6).

■ At oral argument, counsel for claimant stated that the government could not meet its probable cause burden because no drugs were found with the currency. He claimed that the dog sniff did not provide a sufficient nexus to illicit drugs because the scent of drugs could have been caused by prior transactions in which the money was involved long before the claimant came into possession of the currency.

The government recited the following facts in its reply brief in support of its position that it has met its probable cause burden:

1. When claimant first arrived at the airport, large bulges were observed in his pickets, one of which was ultimately determined to be a was of currency (Saunders Dep. at p. 49);

2. Claimant was wearing what appeared to be very expensive gold and diamond jewelry (Gilbert Dep. at p. 26);

3. Claimant did not check any luggage, and was traveling with only one piece of Louis Vuitton luggage (Gilbert Dep. at p. 28);

4. Claimant displayed nervousness as he proceeded to the concourse, looking around from left to right, and looking back at the agents at least three times while on the motorized walkway (Gilbert Dep. at pp. 29–30);

5. After claimant agreed to speak with the agents, it was determined that he resided in and was flying to a major source city—Washington D.C.—with a ticket that he had purchased with cash (Gilbert Dep. at pp. 31–32);

6. When asked about his employment, claimant answered circularly and evasively, ultimately stating that he was in Detroit to expand a family hair salon business, that he could not even name, let alone produce a business card for (Gilbert Dep. at pp. 32–36);

7. Claimant became much even more nervous after he agreed to talk to the agents (Gilbert Dep. at pp. 37–38);

8. Claimant lied to the agents when questioned about his arrest and conviction record (Saunders Dep. at p. 47);

9. A narcotics-trained dog reacted positively to the scent of narcotics on claimant's carry-on luggage (Gilbert Dep. at pp. 41–42);

10. After the canine reaction, claimant changed his story, telling the agents that he was in the entertainment business, and that his clothes might have been exposed to the scent of narcotics (Gilbert Dep. at p. 41);

11. A United States Magistrate-Judge found probable cause to search the bag for narcotics, narcotics paraphernalia and narcotics proceeds;

12. A search of the bag revealed exactly $60,000. in currency, and jewelry with a retail value of $46,558.;

13. Claimant lied to the agents when he told them that he was carrying the currency as a "go-between" for another person purchasing a Jaguar, when in fact he had contracted to purchase the vehicle, and owed $55,000.[4];

14. Although claimant produced tax returns for 1987 through 1989, showing an average annual income of about $60,000., the source of the income is stated to be gambling, and claimant has not produced any evidence to show that the income was actually derived from gambling;

15. In 1987, claimant purchased a 1983 Mercedes Benz for $26,000., paid in full;

16. Despite having a reasonable opportunity during the discovery process to explain the source and intended purpose for the defendant currency, and produce documentary evidence in support of his claim, claimant has refused to answer any questions, apparently believing that his answers might incriminate him (Holmes Dep.).

Government's reply brief at pp. 2–4. Further, in a supplemental brief filed 19 April 1991, the government noted that "the DEA report [attached to the government's motion for summary judgment] indicates that a reliable and credible source of information has identified Holmes as being involved in the drug trade in the Washington, D.C. area." Supplemental brief at p. 3. "The fact that a controlled substance or related paraphernalia was not found ... is not dispositive. In reviewing the record we look to the aggregate of facts, not the presence or absence of one factor." *U.S. v. U.S. Currency $83,310.78*, 851 F.2d 1231,

---

**4.** The court notes that this version of Holmes's story is not particularly credible either. Claimant had just arrived in Detroit and the vehicle was in Virginia. If claimant had intended to purchase the vehicle, it seems odd that he would have left the vehicle in Virginia and traveled to Detroit with the balance of the cash needed to purchase the vehicle.

1236 (9th Cir.1988). The court finds that there is a sufficient nexus to illicit drugs and that the government has met its probable cause burden. Accordingly, because there are no issues of material fact left to determine, summary judgment for the government will be granted.

### ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED that the government's February 15, 1991 motion for summary judgment is GRANTED.