In re John R. HANSON, Debtor.

CLARK & GREGORY, INC., Plaintiff,

v.

John R. HANSON, Defendant.

Bankruptcy No. SG 97–04715.
Adversary No. 97–88371.

United States Bankruptcy Court,
W.D. Michigan.

Sept. 17, 1998.

See also, 1998 WL 870190.

## OPINION

JO ANN C. STEVENSON, Bankruptcy Judge.

> There is no calamity greater than lavish desires.
> There is no greater guilt than discontentment.
> And there is no greater disaster than greed.
> Lao-tzu

The principal issue before this court is whether certain activities of the debtor, John Hanson (Hanson) and the debts arising therefrom should be deemed nondischargeable pursuant to 11 U.S.C § 523(a)(2)(A), § 523(a)(4) and § 523(a)(6) of the Bankruptcy Code. For the following reasons this court concludes that most of the debts arising from these activities are not dischargeable.

The nondischargeability claims presented in this adversary proceeding arise in a case referred to this court by the Standing Order of Reference entered by the United States District Court for the Western District of Michigan on July 24, 1984. This court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Ac-

cordingly, the bankruptcy court is authorized to enter a final judgment subject to the appeal rights afforded by 28 U.S.C. § 158 and Fed.R.Bank.P. 8001 et. seq.

The following constitutes the court's findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052. In reaching its determinations, this court has considered the demeanor and credibility of all witnesses who testified, the exhibits properly admitted into evidence, and the parties' trial briefs and closing arguments.

*Background*

In 1991 Edward Clark, Marv Vander Ark and "Duke" Gregory were asked by John Hanson to invest in a corporation for the purpose of selling high end golf apparel. As a result, Clark & Gregory (C & G) was incorporated in 1992 as a wholesaler of wool and cotton golf sweaters and cotton knit golf shirts. All of the partners hold other positions and work in fields completely unrelated to the golf sweater market.

Hanson was hired as general manager at the company's inception. He had a great deal of expertise and knowledge in the golf sweater business due to his association with the J. McInerney Sweater Company (the McInerney Company). The McInerney Company ceased operations when the United States Customs Service discovered it was under reporting the purchase price of inventory being sent from Scotland on its customs declarations.[1] Hanson, who was involved in this scheme, pled guilty to charges of customs violations and spent six months in a halfway house. Aware of his checkered past, partners of C & G were still willing to give Hanson a second chance as he could provide the golf sweater expertise they lacked.

Hanson's job entailed managing much of the day to day operations of the company including supervising the sales representatives, making sales calls, managing sales contracts and supervising the ordering and delivery of the inventory. He was also responsible for negotiating and obtaining contracts with vendors for the production of sweaters both here and abroad. Some of the vendors Hanson contracted with on behalf of C & G were Blair Knitwear and Peter Scott & Co. (Peter Scott) in Scotland and Steveco Fabric Company, Merry Maid, Embroidery Resource and Perrigo Printing in the United States. All were considered major vendors. In addition to these duties he would travel throughout the United States to work with other C & G sales representatives making individual calls on PGA tournaments and larger golf courses in hopes of obtaining business for various golf invitationals.

Everything appeared to be going well between Hanson and C & G until April of 1994.[2] At that time Hanson met with Les Blair (Blair), the owner of Blair Knitwear and demanded that he be paid 30 pence per sweater for every sweater ordered by C & G[3]. Blair protested until Hanson threatened to move all of C & G's business to Peter Scott, Blair's direct competitor. Removal of the business would apparently have crippled Blair Knitwear to the point of ruin. When Blair argued that the added cost would cut into his profits, Hanson stated that he would simply approve an increase in the price of the sweaters from Blair Knitwear thereby passing on the extra cost to C & G. Hanson of course never informed C & G that he was receiving 30 pence per sweater from Blair; instead he represented that the increase in the cost of the sweaters was a result of burgeoning operating costs at the mill.

As time went by, Hanson became greedier. He demanded that his kickback be increased from 30 pence to 50 pence per sweater and that he be paid a flat fee of 250 pounds[4] per

---

1. The mill in Scotland would place a reduced price on the customs declaration and then fax the McInerney Company the bill for the correct amount.

2. So well in fact that C & G had made him a 15% shareholder and had planned on promoting him to president of the company.

3. Blair Knitwear had sold the mill to the McInerney Company and took it back after McInerney's dissolution. Blair also operated the mill during the course of the customs fraud scheme.

4. Blair and Hanson converted all pounds at an average rate of 1.55 pounds to the dollar.

week. He again passed the added cost on to C & G in the form of higher prices.[5]

With his schemes solidly in place, Hanson then began to augment his kickback revenue by increasing the amount of inventory ordered by C & G. In less than one year, Hanson had ordered approximately two years worth of inventory from Peter Scott and Blair Knitwear. In order to pay for the excess inventory, C & G used its credit line and to this day continues to pay interest on the outstanding principal.

In addition to the kickbacks, Hanson happened upon another way to increase his personal wealth. In late 1995, the Las Vegas Invitational golf tournament placed an order with C & G for approximately $142,500 worth of merchandise. By early 1996, Hanson had conspired with Blair to divert the order to Blair and himself, cutting C & G out of the deal completely.

By March of 1996, Hanson's schemes began to unravel. Upon learning that Hanson tried to counterfeit prototype sweaters which Blair Knitwear produced and have them manufactured by another mill, Blair grew tired of dealing with Hanson. Blair contacted the principals of C & G. An investigation ensued and Hanson's employment was terminated on June 3, 1996.

During his discussions with C & G, Blair issued an affidavit setting forth all the information he had divulged in the meetings. He also offered to split the Las Vegas Invitational golf sweater order with C & G but they refused, claiming the order was rightfully theirs, adding that they had been financially harmed to a much greater extent than Blair

Knitwear. Shortly thereafter Blair gave Hanson an affidavit recanting his previous admissions and disappeared with the Las Vegas Invitational profits on an extended boat trip.[6]

■ C & G filed a complaint against Hanson in Kent County Circuit Court alleging fraud, breach of fiduciary duty and conversion. C & G filed a Motion for Summary Judgment solely on the fraud count. The state court granted the motion with respect to the kickback payments Hanson received from Peter Scott in the amount of $58,-050.00.[7] The state court then scheduled a hearing to determine the extent of C & G's damages as a result of the excess ordering of inventory.

On the day of the hearing, Hanson stated that he would refute C & G's claim even though he had earlier asserted his Fifth Amendment right. Not wishing to deprive him of his right to be heard, the court adjourned the hearing so the parties could take Hanson's deposition.[8] On the eve of the deposition, Hanson filed bankruptcy under Chapter 7. C & G promptly filed a non-dischargeability complaint under 11 U.S.C. § 523(a)(2), (4) and (6) and an objection to discharge under 11 U.S.C. § 727(a)(2) and (4).

Trial was set to begin in the Bankruptcy Court on April 13, 1998. On March 10, 1998, Hanson filed a Motion to Adjourn the Trial. It was denied on March 13, 1998. C & G attempted to schedule the deposition of Hanson's accountant, Thomas Dahlstedt. These attempts were resisted based on the grounds

**5.** Hanson employed a similar scheme with Peter Scott. He demanded to be paid a "commission" on each sweater threatening to remove existing orders and refusing to make additional purchases. At first, Hanson was receiving kickbacks of 75 pence per sweater but later demanded one pound per unit.

**6.** The court believes that Blair disappeared not only because of the dispute over the Las Vegas Invitational profits but also because he realized that the admissions in his first affidavit made him a co-conspirator and equally culpable in defrauding C & G.

**7.** Based on this court's opinion of *In re Shaw*, 210 B.R. 992 (Bkrtcy.W.D.Mich.1997), the judgment entered in state court on C & G's Motion

for Summary Disposition, which was actively opposed by Hanson, is entitled to collateral estoppel effect. This precludes further litigation with respect to the Peter Scott kickback scheme.

**8.** The state court also granted C & G's request to enter Hanson's property to seize assets to satisfy their judgment. The sheriff's department seized much of Hanson's personal property which Hanson later exempted in his bankruptcy petition. Pursuant to a stipulation with C & G, the seized property was returned to him with the exception of the property belonging to C & G, consisting of various sweaters, shirts and golf accouterments.

of accountant/client privilege. On April 1, 1998, C & G filed a Motion to Compel the Testimony of Mr. Dahlstedt with an *ex parte* order. The court granted that motion on April 3, 1998. The same day, a Motion to Reconsider was filed by Hanson. On April 7, 1998, the court issued an order denying the Motion to Reconsider noting that the Supreme Court expressly disapproved of the so-called "accountant-client" privilege stating that "no confidential accountant-client privilege exists under federal law, and no state created privilege has been recognized in federal cases." *Couch v. United States*, 409 U.S. 322, 334, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973).

On April 8, 1998, a hearing was set for each party's objection to the other's exhibit list but prior to the hearing the objections were withdrawn. C & G was allowed to amend its witness and exhibit lists in an order bench filed and signed on April 13, 1998.

On the morning of trial, this court addressed an issue which had been raised as a result of Hanson's invocation of his Fifth Amendment privilege in the bankruptcy. Concerned that this might require the dismissal of his Chapter 7, the Court asked counsel to brief the issue. Having examined the course the Chapter 7 had taken to date, including the Schedules and Statement of Affairs filed as well as the transcript of the 2004 examination, the court concluded that since Hanson first invoked his Fifth Amendment privilege at the 2004 examination, he could remain as a debtor in light of *Butcher v. Bailey*, 753 F.2d 465 (6th Cir.1985).

Hanson then made a request that he be permitted to file an Amended Answer in which he would admit as nondischargeable the $58,050.00 debt resulting from the Peter Scott judgment ordered by the state court and the $83,663.03 which he received in kick-

backs from Blair Knitwear. C & G objected stating that the $83,663.03 did not reflect the excess inventory that was ordered in furtherance of Hanson's fraud, the conversion of goods found in Hanson's house or the conversion of the Las Vegas Invitational order. Pointing out that the excess inventory issue was never pled in the complaint, the court allowed C & G to amend its complaint under Fed.R.Bankr.P. 7015(a). Hanson thereupon withdrew his Amended Answer and on April 15, 1998, a Second Amended Complaint was filed.[9]

Also on the first day of trial, Hanson decided to waive his Fifth Amendment privilege and testify. C & G objected on the basis of surprise and unfair prejudice, reminding the court that Hanson had used the same tactic in the state court action. Although the court ruled at trial that it was too late for Hanson to waive his Fifth Amendment privilege,[10] a discussion of the Fifth Amendment and its effect is necessary.

### Fifth Amendment Privilege

Invoking the Fifth Amendment[11] during discovery in the state court proceedings only to waive it at the commencement of trial, and subsequently attempting to repeat the pattern in the Bankruptcy Court is a purposeful waste of the opposition's time and resources along with those of the state and federal courts. A defendant may not use the Fifth Amendment to shield [him]self from the opposition's inquiries during discovery only to impale [his] accusers with surprise testimony at trial. *Bramble v. Kleindienst*, 357 F.Supp. 1028 (D.Colo.1973). Allowing Hanson to waive the Fifth Amendment privilege at trial in the Bankruptcy Court after he invoked it throughout the state court proceeding, the 2004 examination and discovery would have allowed him to first impale his accusers and then twist the knife. Other

---

**9.** C & G also withdrew the 11 U.S.C. § 727 counts in its Second Amended Complaint.

**10.** The court made many evidentiary rulings at trial but only the evidence properly admitted and received has been considered in this opinion.

**11.** Regardless of whether Hanson can ultimately pay C & G's claim, there is a more important motivating factor behind Hanson's assertion of

his Fifth Amendment privilege. He is currently under investigation by the United States Customs Service for certain customs violations If convicted, the length of the sentence which Hanson will serve will be determined in part by the dollar amount of this judgment. Hanson is also facing possible charges by the Internal Revenue Service for failing to report income from the kickback scheme on his tax returns.

courts have ruled similarly under the same circumstances. In *United States v. Sixty Thousand Dollars*, 763 F.Supp. 909 (E.D.Mich.1991), the court stated, because the claimant has asserted a Fifth Amendment claim in discovery, he may not now waive the privilege and testify. Likewise in *Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir.1989), the court found that the defendant was not denied his Fifth Amendment rights when he was denied the opportunity to testify at trial after asserting the privilege during discovery. In the course of this case Hanson asserted the Fifth Amendment privilege a minimum of 198 times in the state court action and 138 times in the bankruptcy court. In addition he asserted the Fifth Amendment in his 2004 examination after assuring the state court he would not assert the privilege again. For these reasons the court found that Hanson was barred from offering any testimony or affidavits on any issues in this case.

In *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) the United States Supreme Court observed that the Fifth Amendment does not forbid adverse inferences against parties in civil actions when they refuse to testify in response to probative evidence offered against them. When Hanson asserted his Fifth Amendment privilege not to respond to discovery requests, this court was allowed to draw the inference that any testimony Hanson would have offered would be against his interests. Other cases where courts have held that adverse inferences may be drawn from an assertion of privilege include *General Motors Acceptance Corporation v. Bartlett*, 154 B.R. 827 (Bankr.D.N.H.1993); *In re Metzgar*, 127 B.R. 708 (Bankr.M.D.Fla.1991) and *United States v. Sixty Thousand Dollars*, 763 F.Supp. 909 (E.D.Mich.1991), (a civil defendant is barred from offering any testimony on matters to which he asserted his Fifth Amendment privilege).

Once a debtor invokes his right against self-incrimination concerning matters uniquely within his own knowledge, the court is allowed to shift to the defendant the burden of going forward with evidence to rebut a plaintiff's claim. *In re Crabtree*, 39 B.R. 718 (Bankr.D.Tenn.1984). Because Hanson refused to testify concerning documentary and other evidence uniquely within his knowledge, it was his burden to show that certain evidence submitted by C & G was untrustworthy. Hanson failed to do this.

### Nondischargeability Under 11 U.S.C. § 523(a)(2)(A)

C & G seeks a judgment for nondischargeability against Hanson under 11 U.S.C. § 523(a)(2)(A) which states in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or insider's financial condition;

The elements of a nondischargeability claim under § 523(a)(2)(A) are set forth in *Longo v. McLaren*, 3 F.3d 958, 961 (6th Cir.1993):

[i]t is well established that in order to except a debt from discharge under § 523(a)(2)(A) the creditor must prove that the debtor obtained money through a material representation that at the time the debtor knew was false or made with gross recklessness as to its truth. The creditor must also prove the debtor's intent to deceive. Moreover, the creditor must prove that it reasonably relied on the false representation and that its reliance was the proximate cause of loss.

The Supreme Court modified these requirements in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), holding that the proper standard for reliance was not the "reasonable" standard but the "justifiable" reliance standard.

The type of fraud which comes within the ambit of § 523(a)(2)(A) is actual fraud, which involves moral turpitude or intentional wrong. *Matter of Foreman*, 906 F.2d 123 (5th Cir.1990), *rev'd on other grounds by, Grogan v. Garner*, 498 U.S. 279,

111 S.Ct. 654, 112 L.Ed.2d 755 (1991). In order to prove actual fraud it is necessary to show that the debtor intended to deceive the creditor in an attempt to obtain money *McLaren,* supra, at 961. If room exists for the court to infer honest intent, the issue of dischargeability must be decided in favor of the debtor. *Van Wert National Bank v. Druckemiller,* 177 B.R. 859, 861 (Bankr. N.D.Ohio 1994). The Supreme Court has instructed that only "honest but unfortunate" debtors should be afforded a "fresh start" in bankruptcy. *Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). Therefore, it was the burden of C & G to prove every element of their case by a preponderance of the evidence. *Grogan,* supra, 498 U.S. at 291, 111 S.Ct. at 661.

**The Basic Kickback Scheme**

 Hanson made a surreptitious deal with Blair to receive money on the side in addition to his salary from C & G. He concocted a plan and assured Blair that the added expense would be passed on to C & G so his middleman would not be harmed financially. He then intentionally misrepresented his scheme to C & G by affirmatively stating that the price of wool had risen at the vendor's mill in order to explain the rise in cost and hide his excess income. By lying to C & G about the increase in expense to produce the sweaters, he made a material misrepresentation to creditor C & G. This court can not infer any honest intent from this series of events. Hanson knew his representations were false. The truth cannot be construed in any sane or logical way to conclude otherwise. Hanson made material misrepresentations to C & G, knowing they were false and intending to deceive.

Having found the first three requirements for fraud, the final element of § 523(a)(2)(A) is whether C & G justifiably relied on Hanson's misrepresentations thereby causing it financial harm. The "reliance" element is the critical issue in this dischargeability action. C & G hired Hanson after knowing that he had a previous conviction relating to fraud. With this knowledge, was C & G's reliance on Hanson justified? In order to answer this question, the nature of Hanson's relationship with C & G must be closely examined.

Edward Clark testified that during the first few years of his employment Hanson would start each meeting with a statement of appreciation to the partners for giving him a second chance. He would repeatedly thank them for their trust in him and state that he would do his best to make sure it was not misplaced. Tears would well up in his eyes. The fact that Hanson was an exceptional salesperson was the primary reason they had decided to fund the operation. Nevertheless, the partners felt that they had sufficient internal controls in place to keep Hanson reined in.

Each of the three partners had full-time positions of responsibility in other businesses. Hanson had expertise in a field where the partners had almost none. Hanson proved his loyalty and dedication for at least two years before he implemented his scheme. By that time the partners had been lulled into trusting him and believed that he had either been the fall guy in the McInerney troubles or had learned his lesson. Because of the time lapse between the start of the business and the time Hanson started to defraud his employer, and the fact that adequate internal controls were in place, the court finds that C & G justifiably relied on Hanson's misrepresentations.

Based on the record before the court, we find that as to the kickback portion of Plaintiff's complaint, a total of $141,713.03 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Of that amount, $83,663.03 was, according to Hanson's own records, received from Blair Knitwear and $58,050.00 was the amount awarded by the state court judgment vis á vis kickbacks Hanson received from Peter Scott.

**The Excess Inventory**

 The excess ordering of inventory was simply a vehicle to augment the spoils of the underlying fraud. Even though it was merely a method to accomplish the fundamental deception, C & G did incur additional costs when Hanson employed this method of obtaining greater kickbacks. Since the underlying debt has been determined nondischargeable, the only issue remaining is the

amount of damages resulting from this portion of the fraud.

The testimony was inconclusive and confusing. We know, however, that even if there had been no "kickback scheme," in the ordinary course of business at the end of every year, approximately 15% of that year's new inventory remains unsold. We also know that over time, a high proportion, perhaps all, of the remaining inventory eventually is sold, albeit for significantly less than the initial anticipated sale price. Both these conclusions support the court's determination that it would be inappropriate to assess as damages all of the remaining excess inventory as of the trial date.[12] At this juncture, there are three options. Based on the finding that the testimony on this issue was inconclusive and confusing, we could determine that an exact dollar amount can not be assessed as to the remaining excess inventory issue. Accordingly, we would award no damages because C & G failed to carry its burden.

Or an arbitrary number could be chosen based on the best guess of the number or percentage of excess inventory which would ultimately remain unsold. Of course this calculation would be incredibly difficult to compute with any accuracy based on the record now before the court. The excess inventory could take years to liquidate. So the final damage amount, though perhaps explainable would still fall far short of being accurate.[13]

The third possibility, and the one which seems both legally and equitably supportable, is the one we choose here. That is, the court hereby requires counsel to determine if they can agree on the damages which should be assessed for remaining excess inventory, taking into consideration that over time most of the excess inventory will be sold, albeit at less than the original sale price. If not, a one-half day evidentiary hearing shall take place on Wednesday, November 4, 1998, commencing at 8:45 A.M. That hearing will be limited to presenting evidence as to the appropriate assessment of damages for remaining excess inventory.

### Nondischargeability under 11 U.S.C. § 523(a)(4)

■ C & G also asserts that the liability arising from their claims against Hanson is nondischargeable pursuant to 11 U.S.C. § 523(a)(4), which provides in pertinent part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

As previously stated, a creditor seeking exception to discharge under § 523 must sustain its burden by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. at 291, 111 S.Ct. at 661. In addition, exceptions to discharge are to be construed strictly. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Manufacturer's Hanover Trust Co. v. Ward*, 857 F.2d 1082, 1083 (6th Cir.1988).

The Sixth Circuit has set forth the elements of an "embezzlement" claim under § 523(a)(4) in *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172–73 (6th Cir. 1996) as:

[T]he fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hand it has lawfully come. A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for the use other than that for which it was entrusted, and the circumstances indicate fraud.

### The Las Vegas Invitational Order

In 1995 Hanson received an order for 500 sweaters totaling $142,500 in revenue from

---

**12.** According to the testimony, C & G had 8,170 units on hand as of April 1998.

**13.** Gary Ramsden, C & G's current President explained that as time goes on, the remaining SKU's (Stock Keeping Unit) end up being off-sized. That is, they have smalls and mediums but no large, extra large and extra, extra large sizes which are the "guts of the sizes—all the superlatives." ... "so, I am going to be down easily half of what the value is. Maybe—maybe even as much as 20% of that value when we actually get down to the last truckload going out." Transcript at 414.

the Las Vegas Invitational. It was memorialized in three copies of the same invoice. The first copy was made out to "John Hanson/C & G." As testified to by Edward Clark, the second copy had C & G's name "whited out" and replaced with "John Hanson/Blair Knitwear." All else basically remained the same. The third copy had John Hanson crossed off with the name Leslie Blair hand written above it so that it read "Leslie Blair/Blair Knitwear."

■ The common law imposes a duty of loyalty on employees, forbidding them from taking action contrary to the interests of their employers. Restatement (Second) of Agency § 387 (1958) ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.") A corollary to the general duty of loyalty is that "an agent who makes a profit in connection with transactions conducted by him on behalf of the principal is under a duty to give such profit to the principal." Restatement (Second) of Agency § 338 (1958). A portion of Hanson's employment duties for C & G was as a sales representative. He traveled to various golf clubs to solicit orders on behalf of C & G. He was entrusted with these orders. He was then required to fill the orders using goods obtained from vendors and pass the profits on to C & G By changing the name on the purchase order from C & G to his own he diverted the order that rightfully belonged to C & G and appropriated it for a use other than that intended by his employer namely himself.

It does not matter that ultimately Hanson did not profit from the transaction in an amount equal to that lost by C & G. Regardless of whether Hanson elected to deposit the revenues of C & G into his own bank account or into the account of a corporation whose president he thought he controlled, the fact remains that Hanson fraudulently appropriated the property to his own use when he changed the name on the purchase order. Therefore the court finds that the profits from the Las Vegas Invitational order in the amount of $72,500.00 are nondischargeable under 11 U.S.C. § 523(a)(4).

## *Nondischargeability under 11 U.S.C. § 523(a)(6)*

Finally, C & G seeks a judgment for nondischargeability against Hanson under 11 U.S.C. § 523(a)(6) which states in pertinent part:

> (a) A discharge under 727 ... of this title does not discharge an individual debtor from any debt—
>
> > (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

In *Kawaauhau v. Geiger*, —— U.S. ——, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) the Supreme Court addressed the scope of the "willful and malicious injury" exception and whether it covers acts done intentionally that cause injury or only acts done with the actual intent to cause injury. The Supreme Court ruled that "intentional" torts, as distinguished from negligent or reckless torts, generally require that the actor intended the consequences of the act, not simply the act itself.

■ Under Michigan law "conversion" is defined as "a distinct act of dominion wrongfully exerted over another's personal property ... [that is] committed by ... intentionally dispossessing another of a chattel, ... [or] ... refusing to surrender a chattel on demand ... *"Borock v. Mathis (In re Clipper International Corporation*, 154 F.3d 565 (6th Cir.Mich.). In an earlier Supreme Court decision it was determined that "debts from conversion are willful and malicious and therefore nondischargeable." *McIntyre v. Kavanaugh*, 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916). The court emphasized that it is the "honest debtor, and not the malicious wrongdoer, that [is] discharged." Id. at 142, 37 S.Ct. 38. (quoting *Tinker v. Colwell*, 193 U.S. 473, 488, 24 S.Ct. 505, 509, 48 L.Ed. 754 (1904)). When a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is "willful and malicious" even absent proof of a specific intent to injure. *Impulsora Del Territorio Sur. S.A. v. Cecchini (In re Cecchini)*, 780 F.2d 1440 (9th Cir. 1986). Also see *Perkins v. Scharffe*, 817 F.2d 392 (6th Cir.1987) and *Ford Motor Credit v. Owens*, 807 F.2d 1556 (11th Cir.1987).

In his deposition in the state court fraud action, Hanson claimed that during the time he was employed by C & G he had taken approximately 20 to 30 sweaters for his own use. When ordered to return the items he returned 40 sweaters, 133 golf shirts and two golf bags claiming they were all he had. However, during the seizure in the state court action the Sheriff discovered another 26 sweaters, 17 golf shirts and two garment bags. Most of the property found in Hanson's possession and control belonged to C & G. Hanson had neither paid for these items, nor had he been given permission to keep them. The items can not be resold because of their age and condition. While there may have been some reasonable explanation why Hanson had this inventory in his possession, his invocation of the Fifth Amendment and the testimony elicited from C & G's witnesses, allows the court to conclude that these items were indeed converted, bringing that action within the discharge exception. Therefore, the court finds $8,400.00 representing the cost to C & G of 51 cashmere sweaters[14] minus the three purchased by Hanson, excepted from discharge under 11 U.S.C. § 523(a)(6).

### Attorney's Fees

At trial C & G sought to recover its litigation costs and attorney's fees as additional damages incurred as a consequence of Hanson's fraud. C & G claimed that it was owed $166,304.73 in attorney's fees and costs and submitted an itemized bill pursuant to 28 U.S.C. § 1920 and § 1924.

As legal support for its claim, C & G cites *Cohen v. de la Cruz*, —— U.S. ——, ——, 118 S.Ct. 1212, 1215, 140 L.Ed.2d 341 (1998), in which the court stated "11 U.S.C. § 523(a)(2)(A) prevents the discharge of all liability arising from fraud, and that an award of treble damages therefore falls within the scope of the exception." At first, it would be easy to apply this opinion with a broad brush and determine that all attorney's fees and costs could be recovered by a plaintiff in a § 523(a)(2)(A) action as long as

actual fraud was found. However, upon a closer examination of *Cohen*, we note that it is imperative to first determine under what circumstances attorney's fees can be granted. Only two circumstances permit such an award: a) when the statute pursuant to which the cause of action has been litigated provides for fees and; b) when the parties have entered into an agreement which provides for the payment of fees and costs.

In *Cohen*, treble damages were sought pursuant to the New Jersey Consumer Fraud Act, NJ Stat.Ann. §§ 56:8–2, 56:8–19 (West 1989), the statute under which Cohen was found to have committed fraud. That statute provided for the award of attorney's fees. In the present case, Hanson is not being held liable pursuant to any Michigan statute let alone one that provides for the imposition of attorney's fees. If he were, *Cohen* would clearly apply. Nor has the court been presented with an agreement between the parties requiring Hanson to reimburse C & G for its attorney's fees and costs in the event of litigation.

C & G also cites *Larson v. Van Horn*, 110 Mich.App. 369, 313 N.W.2d 288 (1981) and *Fagerberg v. LeBlanc*, 164 Mich.App. 349, 416 N.W.2d 438 (1987) in support of its request for attorney's fees. In the *Larson* opinion, the court reiterated the proposition that, "Michigan recognizes the general rule against allowing recovery of attorney's fees as an element of cost or damages, but there are many statutory and judicially created exceptions." Id. at 383, 313 N.W.2d 288. The *Larson* exception was the award of exemplary damages. Exemplary damages, however, have not been awarded against Hanson.

In *Fagerberg*, 164 Mich.App. 349, 416 N.W.2d 438 (1987), the court upheld an award of fees and costs when the costs were "a legal and natural consequence of the wrongful act." The attorney's fees awarded were viewed as consequential damages because they were not incurred during the litigation but were foreseeable expenditures needed to correct the problem, such as the

---

**14.** On reviewing the record the court determined that this figure could be as high as 66 sweaters and also include 150 golf shirts and/or turtleneck shirts, two golf bags and two garment bags, but in C & G's "Summary of Damage Claims" only 51 cashmere sweaters were listed.

surveyor's fees and the attorney's fees expended to correct the title deficiency. This is not the case here. Hanson's actions may have been intentional but the fees and costs spent in litigation were not incurred to rectify the problem but rather to exact damages for Hanson's wrongful behavior. We note, moreover, the oft repeated axiom requiring this court to construe exceptions to discharge narrowly and in favor of the debtor *Kawaauhau v. Geiger*, —— U.S. ——, 118 S.Ct. 974, 975, 140 L.Ed.2d 90 (1998); *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Manufacturers Hanover Trust Co. v. Ward (In re Ward)*, 857 F.2d 1082 1083 (6th Cir.1988); *In re Pauley*, 205 B.R. 501, 505 (Bankr.W.D.Mich.1997); *Armbrustmacher v. Redburn (In re Redburn)*, 202 B.R. 917, 923 (Bankr.W.D.Mich.1996). The only circumstance in which the bankruptcy code specifically allows attorney's fees in discharge litigation is found in § 523(d) which awards attorney's fees to a prevailing defendant.

For these reasons, the court denies C & G's request for attorney's fees and costs.